### THE NORTHERN STAR.

#### Petition of LUBER.

(District Court, E. D. New York.   December 26, 1923.)

#### No. 5603.

**1. Maritime liens ⬅➡4—Mortgagor held without power to bind ship for repairs.**

The purchaser of a vessel, which executed a purchase-money mortgage thereon, providing that it should not have power to suffer or permit liens to be imposed on the vessel, *held* thereby deprived of its general authority as owner to bind the vessel by a lien for repairs under ship mortgage Act June 5, 1920, § 30, P (Comp. St. Ann. Supp. 1923, § 8146¼ooo).

**2. Maritime liens ⬅➡30—Furnisher of repairs held charged with notice that mortgagor was without authority to create lien; "any other reason."**

Ship Mortgage Act June 5, 1920, § 30, R (Comp. St. Ann. Supp. 1923, § 8146¼pp), providing that no lien shall be conferred for repairs or supplies when the furnisher, by the exercise of reasonable diligence, could have ascertained that because of the terms of a charter party, agreement for sale of the vessel, "or for any other reason," the person ordering the repairs or supplies was without authority to bind the vessel therefor, applies where repairs were ordered in the home port by the owner, which had given a purchase-money mortgage on the vessel, providing that it should not have power to subject it to liens, which mortgage was recorded in the office of the collector of such port, and a copy was kept on board among the ship's papers.

**3. Shipping ⬅➡33—Preferred mortgage does not lose its status because of failure of collector to make indorsement on ship's documents.**

The provision of Ship Mortgage Act June 5, 1920, § 30, D (d), being Comp. St. Ann. Supp. 1923, § 8146kkk, requiring the collector of customs to indorse a preferred mortgage on the ship's documents, is directory, and a mortgage duly recorded in the office of the collector does not lose its status as a preferred mortgage because of his failure to make such indorsement.

---

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by the Morse Dry Dock & Repair Company against the steamship, Northern Star; Harry Luber, intervening petitioner. Libel dismissed, and decree for intervener.

Barber & Stetson, of New York City, for libelant.

Gerson C. Young, of New York City, for intervening petitioner.

CAMPBELL, District Judge. This is a suit in admiralty. The libelant seeks to recover against the steamship Northern Star, and filed a libel for the sum of $1,801.87 for work, labor, and services alleged to have been performed and supplies alleged to have been furnished in making repairs to the steamship Northern Star, between the 14th day of November, 1920, and the 27th day of November, 1920, at the special instance and request of the American Star Line, Inc., alleged to have been in possession of said steamship at that time.

Harry Luber, intervening petitioner, answered denying any knowledge, information, or belief as to the performance of the services and furnishing of the supplies and the reasonableness of the charges therefor alleged in the libel, and alleging that he was the owner and holder of a preferred mortgage, which was a prior lien to any claim of the libelant, and further that by the terms of the said mortgage the creation of any maritime liens upon the said steamship, or any liens which would rank prior to the lien of the said mortgage, was prohibited, and that the libelant could not have any lien on said vessel for the repairs, supplies, and services alleged in the libel.

The amendments to the libel and answer set forth in the stipulation of the proctors for libelant and the intervening petitioner are allowed. Between November 14, 1920, and November 27, 1920, the libelant, at the special instance and request of Mr. Garmey, consulting engineer, who was retained by the American Star Line, Inc., then the owner of the steamship Northern Star, performed certain work, labor, and services and furnished certain supplies in making repairs to said steamship Northern Star, which were of the fair and reasonable value of $1,705.-87, no part of which has been paid. The American Star Line, Inc., was a New York corporation, and New York was the home port of the Northern Star.

On August 9, 1920, the American Star Line, Inc., the owner of the Northern Star, executed and delivered to the United States of America a purchase-money mortgage to secure the payment of the sum of $1,-217,437.50, with interest, covering the said steamship Northern Star; the said indebtedness being evidenced by ten promissory notes totaling that sum. This mortgage on its face showed that it was intended to be a preferred mortgage. On August 11, 1920, the bill of sale from the United States of America to the American Star Line, Inc., of the said steamship Northern Star, was duly recorded in the office of the collector of customs of the port of New York, and on the same day the said mortgage for $1,217,437.50, made by said American Star Line, Inc., covering said steamship Northern Star, was duly recorded in the office of the collector of customs of the port of New York.

The steamship Northern Star was at the time of the recording of the bill of sale and purchase-money mortgage on the high seas, having

left Norfolk, Va., on August 3, 1920, for Stockholm, where she arrived on August 23, 1920. On September 3, 1920, the said steamship left Stockholm for New York, where she arrived on September 21, 1920. On the arrival of the steamship at the port of New York, arrangements were made to put a certified copy of the mortgage aboard the ship; but, they having miscarried, the new first officer left for Norfolk, Va., where he arrived on September 23, 1920, and delivered the certified copy of the mortgage to the captain of the ship, who placed it with the ship's papers and documents, with which it remained ·at all times until the sale by the marshal.

On September 22, 1920, the 'said steamship cleared at the port of New York, but the collector of customs at that port failed to make the indorsement of the mortgage on the ship's papers. On June 27, 1921, the collector of the port of New York made the indorsement of the preferred mortgage on the ship's papers. No reason was shown why the collector failed to perform his duty and make the indorsement of the mortgage on the ship's papers in September, 1920, the first time the said steamship came to the port of New York and cleared after the mortgage was recorded.

On August 4, 1923, the said mortgage was for a valuable consideration duly assigned by the United States of America to Harry Luber, the intervening petitioner, and on August 11, 1923, the said assignment was duly recorded in the office of the collector of the port of New York. The said steamship Northern Star was arrested by process of this court by libel filed by W. S. Pendleton, Jr., & Co. and Joseph A. Rubin, and subsequently sold under a decree in that suit. Before the sale of the said vessel in that suit the libelant herein filed a libel against the said steamship, and the said Harry Luber, as the purchaser of said mortgage, intervened in this suit.

The American Star Line, Inc., was a New York corporation, with an office in New York City, at the time the repairs alleged in the libel in the instant suit were made. The mortgage was recorded in the collector's office at the port of New York, a certified copy was on board the ship, and Mr. Garmey knew of the existence of the said mortgage.

[1] The law in force at the time of the making of repairs by the libelant to said steamship Northern Star, providing for maritime liens for necessaries, is found in subsections P, Q, and R of section 30, Ship Mortgage Act 1920, 41 Stat. 1005 (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo, 8146¼p, 8146¼pp), which read as follows:

Subsection P: "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

Subsection Q: "The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel."

Subsection R: "The officers and agents of a vessel specified in subsection Q shall be taken to include such officers and agents when appointed by a

charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

Under the law as quoted, I am of the opinion that Mr. Garmey had no authority to bind the vessel, nor did the American Star Line, Inc., through whom his authority, if he had any, must have come, have any authority itself to bind the vessel, because of the prohibition contained in said mortgage, even if the said mortgage were not a preferred mortgage.

Section VI, article 1, of the mortgage in question, provides as follows:

"Section VI. To carry a properly certified copy of this mortgage with the ship's papers, and to take such other appropriate steps, as designated to it by the party of the second part from time to time or required by the circumstances, as will give notice to the world that the party of the first part's right, title and interest in the vessel is subject to this mortgage, and that the party of the first part has no right, power nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed superior to or a charge against, the interest of the party of the second part in the vessel."

Under the law as hereinbefore quoted the libelant could not acquire a lien, if it knew or by exercise of reasonable diligence could have ascertained that "for any other reason" the person ordering the repairs, etc., was without authority to bind the vessel therefor. The libelant claims that this does not apply to the owner, but I cannot agree with that claim, because the use of the words "for any other reason," after the words "a charter party, agreement for the sale of the vessel," shows that they are to be construed broadly, and much stronger reasons exist to limit the power of a corporation to bind a vessel and create maritime liens thereon, where it has purchased the same and given a large purchase-money mortgage, than in a case where there has been an agreement to sell a vessel, which sale is not yet consummated.

It would also seem to me that much less was required of libelant in this case, where also the information could be acquired from public records, than is required in case of a charter party, which is not so recorded. The terms of subsection R seem to me to clearly show the intention to include the owner of the vessel among those who by their own agreements may be prohibited from binding the vessel, because it says, "Nothing in this section shall be construed to confer a lien," which shows plainly that the prohibition referred to is not limited to any class named therein, or in any particular subsection, but it is to be construed in connection with the whole of section 30, including, of course, subsections P and Q.

This also further appears to be the true construction, because, when it was intended to refer only to a particular subsection, it was done, as appears early in subsection R, where the word "section" was not used, but it says, "specified in subsection Q." This construction is also strengthened by the fact that subsection R specifies "the terms of

295 F.—24

\* \* \* agreement for sale of the vessel" as a source from which it may be learned that there is no authority to bind the vessel, because the terms of agreement for the sale of a vessel would bind the seller as well as the purchaser, and if the owner, who was making the sale, remained in possession, he would be the one who would by the terms of the agreement be deprived of authority to bind the vessel.

[2] Holding, therefore, as I do, that by the terms of said mortgage the American Star Line, Inc., was prohibited from creating a maritime lien for the repairs made by the libelant, and that such prohibition comes under the term "for any other reason," as set forth in said subsection R, there can be no doubt that, had libelant exercised reasonable diligence, it could have ascertained the fact, because inquiry at the office of the American Star Line, Inc., the records of the collector's office in the custom house, both in New York City, of Mr. Garmey, or of the captain or officer in charge of the ship, would have furnished libelant with complete information.

No evidence was offered to show that any inquiry was made, and no one connected with the libelant whose duty it was to make such inquiry was produced, and therefore I find that no such inquiry was made, and under the terms of the statute the libelant did not acquire a maritime lien on said vessel for the making of such repairs. United States v. Carver, 260 U. S. 482, 43 Sup. Ct. 181, 67 L. Ed. 361, 1923 A. M. C. 47; The Buckhannon (D. C.) 297 Fed. ——, 1923 A. M. C. 645; The Admiral Goodrich (C. C. A.) 288 Fed. 362; The Ascutney (C. C. A.) 289 Fed. 802; The Awensdaw, 289 Fed. 803, C. C. A. 1923 A. M. C. 505; The Northern No. 44, 289 Fed. 805, C. C. A. 1923 A. M. C. 622.

[3] Libelant claims that the said mortgage held by Harry Luber was not a preferred mortgage at the time that libelant made the repairs to said steamship, because it was not indorsed on the ship's papers. So much of the law in force at the time libelant made such repairs to said steamship as is necessary for consideration in the instant case reads as follows:

Section 30, Ship Mortgage Act 1920, 41 Stat. 1000 (Comp. St. Ann. Supp. 1923, §§ 8146¼kk, 8146¼kkk, 8146¼l):

"Subsection C. (a) No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subdivision (b) of this subsection. \* \* \*

"Subsection D. (a) A valid mortgage which, at the time it is made includes the whole of any vessel of the United States of 200 gross tons and upwards, shall in addition have, in respect to such vessel and as of the date of the compliance with all the provisions of this subdivision, the preferred status given by the provisions of subsection M, if—
\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"(b) Any mortgage which complies in respect to any vessel with the conditions enumerated in this subsection is hereafter in this section called a 'preferred mortgage' as to such vessel.

"(c) There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—

\*   \*   \*    \*    \*    \*    \*    \*    \*    \*

"(d) Such indorsement shall be made (1) by the collector of customs of the port of documentation of the mortgaged vessel, or (2) by the collector of customs of any port in which the vessel is found, if such collector is directed to make the indorsement by the collector of customs of the port of documentation; and no clearance shall be issued to the vessel until such indorsement is made. The collector of customs of the port of documentation shall give such direction by wire or letter at the request of the mortgagee and upon the tender of the cost of communication of such direction. Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs.

\*   \*   \*

"Subsection E. The collector of customs upon the recording of a preferred mortgage shall deliver two certified copies thereof to the mortgagor who shall place, and use due diligence to retain, one copy on board the mortgaged vessel and cause such copy and the documents of the vessel to be exhibited by the master to any person having business with the vessel, which may give rise to a maritime lien upon the vessel or to the sale, conveyance, or mortgage thereof. The master of the vessel shall, upon the request of any such person, exhibit to him the documents of the vessel and the copy of any preferred mortgage of the vessel placed on board thereof.'

The duty of indorsing the fact of the existence of the mortgage on the ship's papers is placed upon the collector, and not upon the mortgagor or mortgagee, and must be done by the collector of the home port of the vessel, but, if at that time she is in any other port of the United States, the indorsement may be made by the collector of that port upon direction of the collector of the vessel's home port; but that provision has no application in the instant case, because the vessel at the time of the recording of the mortgage was on the high seas, and no indorsement could have been made until her return to the United States.

The first port at which the said vessel was cleared after the recording of the mortgage was the port of New York, its home port, and it was the duty of the collector to have made such endorsement when said vessel cleared on September 22, 1920. The indorsement on the ship's papers could not be made by the mortgagee, and therefore if the failure of the collector to make such indorsement be held to deprive the mortgage of its status as a preferred mortgage the whole purpose of Congress would fail.

That Congress realized that this situation might arise appears as the reading of the act continued, and in construing any part of section 30 it is necessary to construe it as a whole, and therefore it did not intend to penalize the mortgagee for failure of the collector to perform his duty, but placed the penalty on him. See subsection J (c), being Comp. St. Ann. Supp. 1923, § 8146¼mmm:

"If any person enters into any contract secured by, or upon the credit of, a vessel of the United States covered by a preferred mortgage, and suffers pecuniary loss. \*   \*   \*"

What did the libelant lose by the failure of the collector to make the indorsement? The mortgage was recorded in the same city where the libelant has its place of business, a certified copy was on the ship, and surely more information could be gained from an examination of the

·copy than from any indorsement on the ship's papers. Bark Moshulu, (D. C.) 297 Fed. ——, 1923 A. M. C. 1091. If the libelant suffered any loss, he could recover the same from the collector of the port. Subsection J (c), supra.

I therefore am of the opinion that the provision for indorsing the fact of the mortgage on the ship's papers is directory, not mandatory, and the mortgage in question had a preferred status from the date it was recorded, August 11, 1920. The Nanking (D. C.) 292 Fed. 642, 1923 A. M. C. 1191. In any event the mortgage would be a preferred mortgage from the date of the indorsement, June 27, 1922, and would be a maritime lien, because, even given its strictest construction, the act does not require indorsement on the recording of the mortgage, as it was not only possible, but to be expected, that mortgages would be given while ships were on the high seas, as in the instant case, or in foreign ports, and no indorsement could be made on the papers at the time, because there were no persons at those places who under the law could make such indorsement.

The intervening petitioner is the owner and holder of the mortgage for $1,217,437.50 with interest, default has been made in the payment thereof, and the debt secured by it and the notes are still unpaid. The petitioning creditor is therefore entitled to recover against the vessel, or the proceeds of sale, and the libel herein should be dismissed.

A decree may be entered accordingly, with costs to the intervening petitioner.