ATLANTIC STEAMER SUPPLY COMPANY, Inc., a District of Columbia Corporation

v.

THE TRADEWIND, her engines, boilers, etc.

No. 3799.

United States District Court
D. Maryland.

Aug. 7, 1956.

---

Allen, Burch & Allen, Gordon M. Allen, Baltimore, Md., for libelant.

Lord, Whip & Coughlan, Geo. W. P. Whip, Baltimore, Md., Ober, Williams, Grimes & Stinson, William A. Grimes, Baltimore, Md., Kirlin, Campbell & Keating, New York City, and Piper & Marbury, L. Vernon Miller, Baltimore, Md., Smith, Ristig & Smith, Robert V. Smith, Washington, D. C., Fenneman, Sachs & Cronin, Lawrence B. Fenneman, Baltimore, Md., Norwood B. Orrick, Baltimore, Md., John Geyer Tausig, Washington, D. C., Semmes, Bowen & Semmes, David R. Owen, Baltimore, Md., Solomon B. Levin, Baltimore, Md., for intervening libelants.

John W. Maher, Washington, D. C., and Bernard J. Russell, Baltimore, Md., for trustee.

R. DORSEY WATKINS, District Judge.

This case came before the court on a hearing on exceptions to the answer of the trustee in bankruptcy to the original libel and eight intervening libels. Such exceptions in admiralty are in the nature of the old common law demurrer and for the purposes of the hearing all properly pleaded allegations of fact were taken as true.

On November 9, 1955, the Caribbean Atlantic Steamship Company filed a voluntary petition in bankruptcy in the United States District Court for the District of Columbia and was adjudicated a bankrupt. A receiver was appointed the following day and subsequently qualified. The same day that the receiver was appointed a libel in rem was brought in the United States District Court for the District of Maryland by the Atlantic Steamer Supply Company, Inc., a District of Columbia corporation, against the S. S. Tradewind, a steamship registered under the Liberian Flag, with its home port in Monrovia, Liberia, and owned by the Caribbean Atlantic Steamship Company, a corporation organized and existing under the laws of the Republic of Liberia, with an office and place of business in Washington, D. C., to recover the value of supplies furnished that vessel in the United States at the request of the said corporate owner. The vessel, then being within this district and within the jurisdiction of this court, was seized. The only substantial asset of the bankrupt was the Tradewind and, upon the recommendations of the receiver that she be promptly sold and that such sale could be most advantageously made within this district, the United States District Court for the District of Columbia entered an order, pursuant to the provisions of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., transferring the bankruptcy proceedings to this district. A trustee in bankruptcy was appointed by the United States District Court for the District of Maryland in Bankruptcy and qualified on January 16, 1956. The vessel has been sold and the net proceeds of the sale are being held in the registry of the court to stand in the place of the vessel and subject to the further order of the court pending the determination of the amounts and priorities of the claims against the Tradewind.

Numerous intervening libels have been filed which, for the purposes of this case, may be considered as comprising three different classes of claims. First, the Alaska Steamship Company is claiming a maritime lien on the vessel under a preferred mortgage dated December 27, 1954, executed and delivered by the corporate owner of the Tradewind to the said mortgagee, filed, registered, endorsed on the documents of the vessel, and recorded, all in accordance with the laws of the Republic of Liberia and the provisions of the Ship Mortgage Act, 1920, as amended (46 U.S.C.A. §§ 911–984).[1] The shipowner failed to meet the installment of principal and interest due on October 15, 1955 and was notified on November 1, 1955, by the mortgagee that it was in default. Its adjudication as a bankrupt also constitutes a default within the terms of the mortgage. Second, the original libelant and six intervening libelants (hereinafter referred to as American suppliers), are claiming maritime liens for either repairs, supplies, towage, use of dry dock or marine railway, or other necessaries furnished in the United States to the vessel upon the order of the owner or of one authorized

---

1. As noted above, for the purpose of this hearing the validity of the mortgage as regards its execution and compliance with the requirements of the Ship Mortgage Act, 1920, as amended (46 U.S.C.A. §§ 911–984), has been conceded as the effect of filing exceptions is to confess for the purpose of testing a pleading all well pleaded facts. However, the right of all interested parties to require the mortgagee to prove, in subsequent proceedings, compliance with the formal conditions precedent to the validity of the mortgage, has been expressly reserved.

by the owner, such supplies or services having been furnished after the execution and registration of the mortgage but prior to default by the mortgagor. Third, two other intervening libelants (hereinafter referred to as foreign suppliers) base their right to maritime liens on claims similar to those of the American suppliers except that the services or supplies were furnished to the vessel in ports other than in the United States.

The relevant statutory provisions, found in the Ship Mortgage Act, 1920, as amended, and codified as Chapter 25 of Title 46 U.S.C.A. §§ 911–984, are as follows:

"Sec. 951. Lien of preferred mortgage; foreclosure; jurisdiction; procedure; foreign ship mortgages

"A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in admiralty. Original jurisdiction of all such suits is granted to the district courts of the United States exclusively. In addition to any notice by publication, actual notice of the commencement of any such suit shall be given by the libellant, in such manner as the court shall direct, to (1) the master, other ranking officer, or caretaker of the vessel, and (2) any person who has recorded a notice of claim of an undischarged lien upon the vessel, as provided in section 925 of this title, unless after search by the libellant satisfactory to the court, such mortgagor, master, other ranking officer, caretaker, or claimant is not found within the United States. Failure to give notice to any such person, as required by this section, shall not constitute a jurisdictional defect; but the libellant shall be liable to such person for damages in the amount of his interest in the vessel terminated by the suit. Suit in personam for the recovery of such damages may be brought in accordance with the provisions of subdivision (c) of section 941 of this title.

"Foreign ship mortgages: As used in sections 951–954 of this title, the term 'preferred mortgage' shall include, in addition to a preferred mortgage made pursuant to the provisions of this chapter, any mortgage, hypothecation, or similar charge created as security upon any documented foreign vessel (other than a towboat, barge, scow, lighter, car float, canal boat, or tank vessel, of less than two hundred gross tons) if such mortgage, hypothecation, or similar charge has been duly and validly executed in accordance with the laws of the foreign nation under the laws of which the vessel is documented and has been duly registered in accordance with such laws in a public register either at the port of registry of the vessel or at a central office; and the term 'preferred mortgage lien' shall also include the lien of such mortgage, hypothecation, or similar charge: *Provided, however, That such 'preferred mortgage lien' in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States.* As amended June 29, 1954, ch. 419, 68 Stat. 323." (Emphasis supplied.)

"Sec. 953. Preferred maritime lien; priorities; other liens

"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, op-

erator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

"(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court." June 5, 1920, c. 250, § 30, Subsection M. 41 Stat. 1004."

"Sec. 971. Persons entitled to lien

"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. June 5, 1920, c. 250, § 30, Subsec. P, 41 Stat. 1005."

"Sec. 972. Persons authorized to procure repairs, supplies, and necessaries

"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel. June 5, 1920, c. 250, § 30, Subsec. Q, 41 Stat. 1005."

"Sec. 973. Notice to person furnishing repairs, supplies, and necessaries

"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; *but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.* June 5, 1920, c. 250, § 30, Subsec. R, 41 Stat. 1005." (Emphasis supplied.)

The issue raised by the trustee's answer to the original libel and eight intervening libels [2] is whether or not a provision in a preferred mortgage to the effect that "Neither the Shipowner nor the Master of the vessel has or shall have any right, power or authority to create, incur or permit to be placed or imposed upon the vessel, any liens whatsoever, other than for crew's wages or salvage" can defeat the claims of the American and foreign suppliers to maritime liens. The trustee [3] asserts that each of the

---

2. The trustee has not filed an answer to the intervening libel of Larrabee Associates which claims a maritime lien for advertising services rendered. Therefore, the sufficiency of the pleadings of said intervening libelant will not be considered nor dealt with in this opinion.

3. The mortgagee, Alaska Steamship Company, and the receiver in bankruptcy con-

libels filed fails to allege that the supplier was without knowledge of the fact, or by the exercise of reasonable diligence could not have ascertained, that because of the terms of the mortgage the owner or his authorized agent who ordered the repairs, supplies, or other necessaries, was without authority to bind the vessel and that, in reality, each of the suppliers had actual[4] as well as constructive notice of the mortgage prohibition against the creation of any liens by the owner except those for crew's wages and salvage. The trustee relies on the covenant of the mortgage, quoted above, and the italicized portion of Section 973 of Title 46 U.S.C.A. to prevent the *creation* of a lien in favor of the suppliers. If this position is sound, he correctly asserts that it is unnecessary to consider the question of priority presented by the last clause of Section 951.

The original and intervening libelants[5] excepted to the trustee's answer on the ground that Section 973 does not purport to deal with the authority of an owner to bind his vessel but rather with the authority of a third person to represent the owner so as to create a lien, and that the effect of a preferred mortgage with a covenant such as is herein involved is, in the case of domestic vessels, to subordinate the maritime lien of the supplier to the mortgage lien, but as the Tradewind is a foreign vessel, the mortgage lien is subordinated by the last clause of Section 951 to maritime liens for necessaries performed or supplied in the United States.

The language of Section 973, italicized above, is broad enough to require the supplier to inquire as to the authority of an owner to bind his vessel and to prevent the creation of a lien by him in favor of a supplier who knew, or by due diligence could have known, of the existence of a preferred mortgage in which the owner had contracted away his authority to bind the vessel. In The Northern Star, 1923, D.C.E.D.N.Y., 295 F. 366, 369–370, this phase of the question was carefully considered and the words "'nothing in this section'"[6] indicated to the court that the requirement of due diligence was not limited to the authority of the persons named in Section 973[7] but included anyone named in the whole of Chapter 25 of Title 46 U.S.C.A. and more specifically, under Sections 971 and 972, the owner, himself. The language "for any other reason" appearing in a section of the Ship Mortgage Act, 1920, led the court to believe a prohibition clause in a preferred mortgage was likewise comprehended. "The terms of * * * agreement for sale of the vessel" would bind both the seller and the purchaser, and if the owner, as seller, remained in possession, the court reasoned that the terms of such an agreement could (if so provided) deprive the owner of his authority to bind the vessel. On appeal, The Northern Star, 2 Cir., 1925, 7 F.2d 505, 506, the Circuit Court of Ap-

---

cur in the trustee's position and have advanced oral and written argument to support his contention.

4. As the basic question involved in this proceeding is whether or not Section 973 can be construed as referring to the authority of an owner to bind his vessel, those suppliers having actual knowledge of the mortgage prohibition are in no different position than those who are merely chargeable with knowledge thereof. See The South Coast, 1920, 251 U.S. 519, 40 S.Ct. 233, 64 L.Ed. 386, dealing with the effect of actual notice given to the supplier, by the owner of a vessel under charter, that the master had no power to bind the vessel.

5. One American supplier failed to file exceptions as did both foreign suppliers. However, counsel for a foreign supplier was heard on oral argument. Accordingly, this opinion will deal with the trustee's answer to all nine of the suppliers claiming maritime liens whether or not his answer was formally excepted to by all of them.

6. "Section" refers to Section 30 of Chapter 250, Act June 5, 1920, 41 Stat. 1000 et seq. As codified in Title 46 U.S.C.A. the reference is "nothing in this chapter."

7. To avoid unnecessary confusion, all references in this opinion will be to the present codification of the sections involved.

peals for the Second Circuit reversed on the ground that, as the terms of the preferred mortgage prohibited the creation of a prior lien only, the owner had authority to create a junior lien. Certiorari was granted, and the Supreme Court in Morse Drydock & Repair Co. v. The Northern Star, 1926, 271 U.S. 552, 554, 46 S.Ct. 589, 70 L.Ed. 1082, made the following comment:

"The owner of course had 'authority to bind the vessel' by virtue of his title without the aid of statute. The only importance of the statute was to get rid of the necessity for a special contract or for evidence that credit was given to the vessel. Subsection R,[8] * * * it is true, after providing that certain officers shall be included among those presumed to have authority from the owner to create a lien for supplies goes on that 'nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.' *But even if this language be construed as dealing with anything more than the authority of a third person to represent the owner so as to create a lien,* still when supplies are ordered by the owner the statute does not attempt to forbid a lien simply because the owner has contracted with a mortgagee not to give any paramount security on the ship. *The most that such a contract can do is to postpone the claim of a party chargeable with notice of it to that of the mortgagee."* (Emphasis supplied.)

Justice McReynolds filed a separate opinion noting his dissent as to this portion of the court's opinion.

Other courts before and after the Supreme Court's decision in The Northern Star case, have relied on the phraseology of Section 973. The Bethlehem, 3 Cir., 1925, 4 F.2d 308, held that where due diligence would not have disclosed a mortgage provision denying the owner authority to bind his vessel, failure to make inquiry did not prevent the supplier's maritime lien from arising. No argument, however, seems to have been advanced to the court that Section 973 did not apply to an owner. In The Bergen, D.C.S.D.Cal., S.D., 1931, 50 F.2d 447, 448, following the "clear language of the Ship Mortgage Act", the district court concluded that the statement of Justice Holmes in Morse Drydock & Repair Co. v. Northern Star, supra, was dictum and held that Section 973 required inquiry as to the authority of the owner to bind the vessel. This holding was reversed in The Bergen, 9 Cir., 1933, 64 F.2d 877, 879, where the court, relying on the Supreme Court's comment in the Northern Star case, held:

"Likewise, in the instant case, we think 'the most' that the provision contained in the mortgage can do is to postpone the lien of libelant to that of the holder of the preferred mortgage.

"One who furnishes supplies to a vessel upon the order of the owner thereof is not required to examine the ship's papers or to make inquiry as to the authority of the owner to bind the vessel. Such authority is given him by statute as well as by virtue of his title. To be sure, one who furnishes supplies, etc., to the owner of a vessel is chargeable with notice of a valid preferred mortgage thereon; but, in our opinion, the language used in subsection R[9] deals only with the authority of

---

8. Subsection R of Section 30, Act June 5, 1920, c. 250, 41 Stat. 1005, is codified as Section 973 of Title 46 U.S.C.A.

9. See footnote 8, supra.

third persons to represent the owner, and not of the owner himself."

Subsequent cases have cited the decision of the appellate court in The Bergen, supra, with approval. The Court of Appeals for the Fourth Circuit in International Refugee Organization v. Maryland Drydock Co., 1950, 179 F.2d 284, 289, said:

"IRO [10] argues that Maryland is chargeable under 46 U.S.C.A. § 973 with knowledge of its rights as against the vessel; but the complete answer to this is that the rule of reasonable diligence prescribed by that section has application only where the dealing is with one without authority to bind the owner and has no application where, as here, the dealing is with the owner himself or with an agent whose authority is admitted."

The court then quotes the language of The Bergen case set out above and continues:

"Appellant seeks to give the status of owner under the statute to one who is not the owner but is merely seeking to have a constructive trust declared in equity; but there is nothing in law or in reason to support this position."

It has been argued by the mortgagee, that this statement is in conflict with National Bank of Fayette County v. Enterprise Marine Dock Co., 4 Cir., 1930, 43 F.2d 547, 548:[11]

"We have no doubt that if there had been such an agreement, or mortgage, or provision in a reserve contract of sale, it would have been shown; but even in such a case, it is at least questionable whether *such a reservation would have postponed the lien of the repairmen to the lien of a mortgage not preferred.*" (Emphasis supplied.)

The reservation referred to was that the person ordering the supplies was without authority to bind the vessel. The words italicized are in complete accord with the choice of language employed by the Ninth Circuit in The Bergen case, 64 F.2d at page 879, cited by the Fourth Circuit in the IRO case,

"* * * 'the most' that the provision contained in the mortgage can do is *to postpone the lien of libelant to that of the holder of the preferred mortgage.*" (Emphasis supplied.)

The mortgagee conceded at the hearing on the exceptions to the answer of the trustee that for the preferred mortgage lien on the Tradewind to prevail, the mortgage provision must do more than postpone, it must, in effect, prevent the creation of a supplier's lien. Crofton Diesel Engine Co. v. Puget Sound National Bank, 9 Cir., 1953, 205 F.2d 950, 951–953, dealing with whether or not the terms of certain mortgages should be construed as a waiver by the mortgagee of the preferred status of the mortgages, cites The Bergen case with approval, notes there is nothing incompatible about the simultaneous existence of a fully preferred mortgage and a lien for repairs and supplies, and treats Section 972 as listing persons presumed to have authority to bind the vessel and Section 973 as an enlargement of those presumed to have such authority.

Judge Soper, then a district judge, in The Henry W. Breyer, D.C.D.Md.1927, 17 F.2d 423, 431, had occasion to rule on the effect of a preferred mortgage containing a covenant prohibiting the owner or master from creating any liens other than those for crew's wages, supplies, or salvage and held that the lien claimed

---

10. IRO was a charterer, not a mortgagee, but contended that because a fraud had been practiced upon it in obtaining from IRO an advance made to the owner on the charter hire, a constructive trust was imposed upon the vessel, IRO thereby being the equitable owner and the record owner thereby being deprived of his authority to bind the vessel.

11. Both the National Bank case and Morse Drydock & Repair Co. v. The Northern Star, supra, were relied on by the court in the IRO case.

for services rendered in loading and unloading the vessel must be deferred to the lien of the preferred mortgage. As his opinion in no way indicated that he considered stevedore services within the category of "supplies", liens for which were permitted by covenant, his holding can only be cited as authority for the proposition that the effect of a prohibitory covenant in a preferred mortgage is to postpone the other maritime liens to the lien of the preferred mortgage rather than to prevent the creation of such liens.

To support the contention that a mortgage containing a prohibitory clause similar to the one involved prevents the creation of a supplier's lien rather than merely postponing it to the lien of the mortgage, the mortgagee depends upon various decisions involving charters and agreements to sell. For reasons which will be discussed later these cases are not in point. The only decision cited by the mortgagee, other than the National Bank case, supra, which does relate to a mortgage provision, holds that a clause, in a mortgage not preferred within the meaning of the Ship Mortgage Act, denying the owner authority to create any lien superior to the lien of the mortgage, of which provision the supplier was charged with notice, did not operate as a bar to the creation of a supplier's lien nor to postpone the supplier's lien (Hercules Co. v. Brigadier General Absolom Baird, 3 Cir., 1954, 214 F.2d 66, 73). It is difficult to see what comfort the mortgagee derives from this decision. Attention was called to other language in the case where the court in considering the effect of a prohibitory clause in an agreement to sell on maritime liens claimed for services rendered in 1950 at the request of the prospective purchaser, said, 214 F.2d at page 72:

"If the owner would protect his vessel against liens by repairmen, all he need do is provide in the char-

ter party, mortgage, or agreement for sale that the creation of maritime liens is prohibited."

The import of this statement is that the owner has adequate means to protect his title and interest in his vessel. In this part of the opinion no reference is made to the mortgagee's means of protecting his security, the mortgage involved in the case not having been executed until 1951. The use of the word "mortgage" [12] can not be seized upon as authority for the proposition that a mortgage can operate so as to prevent the creation of a supplier's lien, particularly so, when the holding of that court on this precise point is directly to the contrary.

In attempting to determine the legislative intent in the enactment of statutory provisions it is sometimes helpful to trace prior similar law. Sections 971–975 were enacted originally on June 23, 1910, as Chapter 373 of 36 Stat. 604 et seq. entitled "An Act Relating to liens on vessels for repairs, supplies, or other necessaries." The language of the Act was substantially equivalent to the present wording of Sections 971–975. However, several changes in phraseology will require discussion at a later point. The purpose of the Act was succinctly stated in The Oceana, 2 Cir., 1917, 244 F. 80, 82–83, certiorari denied 245 U.S. 656, 38 S.Ct. 13, 62 L.Ed. 533: [13]

"Obviously the act was passed in restriction of the rights of vessel owners and *in the aid of those who furnish repairs, supplies, and other necessaries*. It wiped out all difference between foreign and domestic vessels, and between repairs, supplies, and other necessaries furnished in the home port, as distinguished from those furnished in foreign ports, and between such as were ordered by the master and such as were ordered by the owners. It created a presumption of law of the vessel's liability for all repairs,

12. Note that the court did not use the words "preferred mortgage."

13. Cited with apparent approval as to the

purpose of the statute in Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 272, 60 S.Ct. 937, 84 L.Ed. 1197.

supplies, and other necessaries ordered by the master, managing owner, ship's husband, charterer, any person to whom the management of the vessel is intrusted at the port of supply, owner pro hac vice, and conditional vendee. *There is an exception in favor of the vessel owner,* relied upon by the claimant in this suit, in the case of repairs, supplies, or other necessaries ordered by a charterer or conditional vendee, who has no authority to bind the vessel; provided the repair and supply men knew, or ought with reasonable diligence to have learned, that the charter or conditional agreement of sale deprived the charterer or vendee of this authority." (Emphasis supplied.)

More specifically, the Act of June 23, 1910, c. 373, Sec. 3, 36 Stat. 605, was identical in its phraseology with the present wording of Section 973 with the exception that the reference back to Section 972 was a reference back to Section 2 of the Act and the present wording "but nothing in this chapter" was originally "but nothing in this Act." It should be remembered that in 1910, prior to the Ship Mortgage Act, 1920, enacted June 5, 1920, c. 250, sec. 30, 41 Stat. 1000 et seq., no mortgage on a vessel had a maritime lien status (The Oconee, D.C. E.D.Va.1922, 280 F. 927, 930). Accordingly, when the predecessor section of Section 973 was enacted in 1910 the language "but nothing in this Act shall be construed to confer a lien when * * * because of the terms of * * * agreement for sale of the vessel, or for any other reason, the person ordering the repairs * * * was without authority to bind the vessel therefor" could not have been intended to refer to the provisions of non-maritime contract over which a court of admiralty had no jurisdiction either by way of a libel to foreclose the mortgage or a libel to assert title or right of possession.

Section 973, when originally enacted as a part of the Federal Maritime Lien Act, created an exception in favor of the vessel owner as against suppliers. If Congress had intended this section, upon its re-enactment as a part of the Ship Mortgage Act, 1920, to be construed as extending this exception to holders of preferred mortgages so as to require suppliers to make inquiry as to the authority of the owner to bind his vessel, the addition of a few words would have made such an intent clear. The careful amendment of Section 974 indicates that when Congress intended a former section of the Federal Maritime Lien Act to be extended to include a mortgage or a preferred mortgage, it used language clearly indicating such an intent. Sections 971–975, as reenacted in 1920, contain no change in wording pertinent to this case except for Section 974 relating to waiver of the right to a lien wherein the following italicized words were added:

"Nothing in this section [14] [originally 'Act'] shall be construed to prevent the furnisher of repairs, supplies, *towage, use of dry dock or marine railway,* or other necessaries, *or the mortgagee,* from waiving his right to a lien, *or in the case of a preferred mortgage lien, to the preferred status of such lien,* * * * and this section [originally 'Act'] shall not be construed to affect the rules of law now existing in regard to * * * (4) *the rank of preferred maritime liens among themselves,* or (5) *priorities between maritime liens and mortgages, other than preferred mortgages, upon vessels of the United States.*"

The Ship Mortgage Act, 1920, passed to encourage investment in domestic vessels by affording better mortgage security, by subsection X of section 30 of c. 250 of Act June 5, 1920, 46 U.S. C.A. § 971 note, repealed Act June 23, 1910, but provided that section 30, " * * * so far as not inconsistent

---

14. "Section", as herein used, refers to section 30 of chapter 250, Act June 5, 1920, 41 Stat. 1005. As codified in section 974 the wording used is "nothing in this chapter" referring to chapter 25 of Title 46 U.S.C.A.

with any of the provisions of law so repealed, shall be held a re-enactment of such repealed law * * *". There is nothing inconsistent with the co-existence of a fully preferred mortgage and a lien for repairs and supplies (Crofton Diesel Engine Co., Inc., v. Puget Sound National Bank of Tacoma, 9 Cir., 1953, 205 F.2d 950, 952). The purpose of a covenant in the mortgage against the creation of liens by the owner is to protect the security of the mortgagee. This purpose is effectuated in the case of mortgages on domestic vessels, by the use of the covenant, if the other procedural requirements of the Ship Mortgage Act are met, in that the covenant constitutes a compliance with Section 922(a) (4) that for a valid mortgage to have the preferred status given under Section 953 it must not stipulate that the mortgagee waives the preferred status thereof,[15] such preferred status, once acquired, giving the mortgage lien priority over subsequent maritime lien claims asserted against the vessel by those furnishing repairs, supplies, or other necessaries at the request of the owner. Indeed, the permitting of the creation of maritime liens subordinate to, and without waiving the preferred status of, the mortgage lien protects the security of the mortgagee to the extent that keeping the vessel in service is to his advantage for, as the Supreme Court said in Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., supra, 310 U.S. at page 280, 60 S.Ct. at page 943, "The origin of the maritime lien is the need of the ship. Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., supra.[16] The lien is given for supplies which are necessary to keep the ship going."

The mortgage held by the Alaska Steamship Company on the Tradewind contains language somewhat contradictory in that several of its provisions seem to anticipate the creation of liens other than those for crew's wages and salvage. In addition to the prohibitive covenant, previously quoted and set out in section 5 of the mortgagor's covenants, section 7 provides:

"If a libel shall be filed against the vessel, or if the vessel shall be levied upon or taken into custody, or detained by any proceeding in any court or tribunal or by any Government or other authority, the Shipowner within fifteen (15) days thereafter will cause the vessel to be released and any lien thereon, other than this Preferred Mortgage, to be discharged."

In the event of a default by the shipowner in the observance of sections five or seven (among others not germane to these proceedings) the mortgagee is empowered to defend any suit pending against the vessel because of any alleged lien against the vessel and to discharge such lien, the expenditures thereby incurred by the mortgagee to be secured by the lien of the mortgage. Any proceeds from the sale of the vessel are to be applied first to expenses and charges incurred by the mortgagee and "to provide adequate indemnity against liens claiming priority over or equality with this Preferred Mortgage." It is also worthy of note that the relief prayed for by the mortgagee, in part, in its intervening libel filed prior to the trustee's answer, is that the lien of the preferred mortgage be declared prior and superior to the claims of all persons except such "as may hold preferred maritime liens on the vessel, or maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States."

Justice Holmes speaking for the Supreme Court in United States v. Carver, 1923, 260 U.S. 482, 487–490, 43 S.Ct. 181, 67 L.Ed. 361, in construing the

---

15. For language constituting a waiver by the mortgagee of the preferred status see Judge Soper's opinion in The Henry W. Breyer, D.C.D.Md.1927, 17 F.2d 423, 432. Also: Crofton Diesel Engine Co.

v. Puget Sound National Bank of Tacoma, supra, 205 F.2d at pages 951–952.

16. 1920, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97.

terms of a charter-party which provided that the charterer " 'will not suffer nor permit to be continued any lien, encumbrance, or charge which has or might have priority over the title and interest of the owner in said vessel' " with the further stipulation that in any event within fifteen days the charterer would make adequate provision for the satisfaction or discharge of every claim that might have priority over the title, etc., or would cause such vessel to be discharged from such lien in any event within fifteen days after it was imposed, held that, the primary undertaking being that a lien should not be imposed, the supplier got no lien. Yet in Morse Drydock & Repair Co. v. The Northern Star, supra, where the terms of the mortgage depriving the owner of his authority to bind the vessel were identical [17] with those in the Carver case, Justice Holmes, again speaking for the Supreme Court, said, 271 U.S. at page 554, 46 S.Ct. at page 590:

> "The most that such a contract can do is to postpone the claim of a party chargeable with notice of it to that of the mortgagee."

These two cases clearly bring out the difference in the relationship of a mortgagee to a supplier and of an owner to a supplier. Any lien once created against the vessel interferes with the title and interest of the owner whereas only a lien having priority over the preferred mortgage lien can affect the security of the mortgagee.

Accordingly, this court holds that Section 973 was enacted and re-enacted as an exception in favor of the vessel owner and deals only with the authority of a third person to represent the owner so as to create a lien. It does not prevent the *creation of a lien* as such (the

status of the lien being another matter) against the vessel by an owner in favor of a supplier irrespective of the prohibitory terms of any mortgage covenant made by the owner to the mortgagee. To hold otherwise would be to nullify the effect of other provisions of the Ship Mortgage Act, 1920, in that a ship's mortgage which failed to comply with the procedural requirements of the Act, necessary to achieve the status of a preferred mortgage, could nevertheless not only gain priority over the supplier's claim but would relegate it to a nonmaritime status where the supplier knew, or with due diligence could have learned, of the terms of the mortgage. It has been argued that the Supreme Court's statement in the Morse Drydock Co. case, supra, regarding the inapplicability of Section 973 to an owner's authority to create liens, was dictum in that the ruling of the case was that the mortgage lost its preferred status because of its failure to comply with the procedural requirements of the Ship Mortgage Act and that the covenant involved did not forbid the creation of all liens but only of liens having priority over the mortgage lien. If the mortgage was not preferred (and the court so held), any valid maritime lien created had priority over the mortgage lien and, consequently, its creation prohibited by the terms of the covenant. Had the reasoning of the district courts in The Northern Star case and The Bergen case, based on the "clear language" of Section 973, been accepted, the terms of a valid mortgage, preferred or not within the meaning of Section 922, whether on a domestic or foreign vessel, would have come within the purview of Section 973 provided the terms of the mortgage denied the owner authority to bind the vessel.[18] In the case of a

---

17. The shipowner covenanted "not to suffer or permit to be continued any lien that might have priority over the mortgage, and in any event within fifteen days after the same became due to satisfy it."

18. See the separate opinion of Justice McReynolds in Morse Drydock Co. v. The Northern Star, supra, 271 U.S. at pages

556–557, 46 S.Ct. at page 590, in which the terms of a non-preferred mortgage were held to prevent the creation of a maritime lien in favor of the supplier. The majority opinion of the Supreme Court was to the contrary. The Court of Appeals for the Fourth Circuit has not been called upon to decide this exact issue but has cited the majority opinion as au-

valid preferred mortgage on a domestic vessel the mortgagee never has to rely on the provisions of Section 973 as his interest in the vessel is adequately protected under Section 953 which gives the preferred mortgage lien priority over all claims against the vessel, except preferred maritime liens and certain litigation expenses allowed by the court.

█ In the instant case, however, the preferred mortgage lien is deferred, as to the liens claimed by the American suppliers, by the last clause in Section 951, as amended June 29, 1954, which provides that in the case of a foreign vessel the preferred mortgage lien is subordinated to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States. The purpose of the 1954 amendment to the Ship Mortgage Act, 1920, is set out in the committee reports of both the Senate [19] and House [20] as being to pro-

thority (International Refugee Organization v. Maryland Drydock Co., supra, 179 F.2d at page 288; National Bank of Fayette County v. Enterprise Marine Dock Co., supra, 43 F.2d at page 548. See also Hercules Co., Inc., v. Brigardier General Absolom Baird, supra, citing and following the majority opinion in the Morse Drydock Co. case).

19. The Senate Committee on Interstate and Foreign Commerce stated (S.Rep. 1213, 83d Cong., 2d Sess. pp. 1–2):

"This bill, as reported, would amend section 30, subsection K, of the act of June 5, 1920, as amended, known as the Ship Mortgage Act, 1920 (41 Stat. 1003). It would do so by adding at the end of subsection K a provision which, in giving mortgagees of foreign documented vessels a 'preferred mortgage lien' (as that term is used in subsections K, L, M, and N of the act), would permit them to enforce such mortgages by bringing on the admiralty side of United States district courts in rem foreclosure suits. However, it should be noted that this bill, as reported, would subordinate these new preferred mortgage liens to 'maritime liens for repairs, supplies, towage, use of drydock or marine railway or other necessaries, performed or supplied in the United States.'

"In permitting foreign ship mortgagees to enforce such mortgages in admiralty proceedings in the Federal courts, this bill, as reported, would enable such mortgagees to resort to the same appropriate, well-suited judicial forum which has been available to certain domestic ship mortgagees since the enactment of the Ship Mortgage Act of 1920. In so doing it probably will make obsolete the present cumbersome and relatively ineffective method of foreclosing foreign ship mortgages by civil actions in the United States district courts.

"Committee Amendments

"On page 2, line 14, after the word 'necessaries', strike out the period and the quotation mark, substitute a comma and add the following language: 'performed or supplied in the United States.'

"Unamended, the bill's 'proviso' (p. 2, lines 11–14) would subordinate preferred mortgage liens arising from foreign ship mortgages to 'maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries.' However the amendment is made because, as the Secretary of Commerce stated in his letter of March 4, 1954, to the chairman of the Committee on Interstate and Foreign Commerce:

" 'There appears to be no reason to include within the operation of the proviso liens arising from repairs and supplies furnished outside the United States, and thereby give a foreign repairman a priority which even under the laws of his own country might not be accorded him.' "

Filed with the committee's report is a letter from the Deputy Attorney General of the United States, herein quoted in part, explaining the views of the Department of Justice and citing as an authority the opinion of the Fourth Circuit in International Refugee Organization v. Maryland Drydock Co. (The San Francisco), 179 F.2d 284, discussed in this opinion, 144 F.Supp. 415:

"The proviso in the bill, subordinating the mortgage lien in the case of foreign vessels to the liens of suppliers, appears to have been written to meet the objection of drydock and repair yard owners in the United States. They assert that in the short time available in their business their facilities for discovering the existence of a foreign ship mortgage are not adequate as is the case with American-flag vessels. They ask, therefore, that their liens for repairs, supplies, towage, use of drydocks, or marine railway, or other necessaries, should be prior to the mortgagee's claim where mortgages of foreign ships are involved.

20. See page 421.

vide an adequate judicial forum for the effective foreclosure of mortgages on foreign documented vessels, the lien of such a mortgage being subordinated to maritime liens for repairs, supplies, and other necessaries performed or supplied in the United States. For reasons explained in both committee reports, the mortgage lien is not so subordinated to the maritime lien of a foreign supplier.

"It might be well to make it clear that this bill will merely provide a forum on the admiralty side for litigation as to ship mortgages; that it does not give foreign ship mortgages the same order of priority over repair and other liens which is now given to preferred ship mortgages on United States-flag vessels; and that in the adjustment of priorities the admiralty court is to follow the established admiralty rules relative to general priorities between maritime liens on foreign vessels which are sold by the court. The admiralty courts in this country have well-established rules respecting the relative priorities in cases where foreign ships are sold by the courts of this country (See The City of Athens, D.C.D.Md.1949, 83 F.Supp. 67; The San Francisco, 4 Cir., 1950, 179 F. 2d 284).

"Accordingly, the Department of Justice finds no objection to the enactment of the bill."

20. The House Committee on Merchant Marine and Fisheries (H.Rep. 1662, 83d Cong., 2d Sess., p. 3) incorporates a letter from the Secretary of Commerce, in part, as follows:

"While thus providing a forum on the admiralty side of the United states courts in the enforcement of defaulted foreign mortgages, the bill does not give these foreign ship mortgages the same order of priority over subsequent repair and other liens given under existing United States laws to preferred ship mortgages on United States flag vessels. A proviso at the end of the bill provides that, in case of mortgages on foreign vessels, the mortgage lien shall be subordinated to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries. Under existing United States law, preferred mortgage liens on United States flag vessels come ahead of maritime liens for repairs, supplies and necessaries furnished subsequent to the mortgage liens. On

Accordingly, the exceptions to the trustee's answer to the original libel and the eight intervening libels are sustained with, as among the parties to this proceeding, priority over the preferred mortgage lien to be given to the liens of the American suppliers, the liens of the foreign suppliers being subordinated to the lien of the preferred mortgage.

the other hand, the bill improves the position of the holder of a mortgage on a foreign vessel, for under existing United States law he may only foreclose in an equity proceeding in the United States court and in such case the mortgage lien is subordinate to all maritime liens.

"The bill does not prejudice or destroy the substantive rights of an American mortgagee of a foreign-flag vessel. Such mortgagee can foreclose in a foreign court which acts independently of the Ship Mortgage Act, 1920, and secure the higher priority, if any, given the mortgage by the law of the foreign country. On the other hand, if the United States mortgagee wishes to foreclose in admiralty in the United States courts, he could do so under the bill and get the benefits of the simplified procedure not available to him under the existing law. Thus, while the bill does not give the holder of a mortgage on a foreign vessel the same preference or priorities as the holder of a mortgage on a United States vessel, it provides him an expeditious foreclosure proceeding and takes away no procedural or substantive right which he now has.

"There appears to be no reason to include within the operation of the proviso liens arising from repairs and supplies furnished outside the United States, and thereby give a foreign repairman a priority which even under the laws of his own country might not be accorded him. It is recommended, therefore, that the last proviso in the bill be amended to read as follows: *'Provided*, That such "preferred mortgage lien" in the case of a foreign vessel shall also be subordinated to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States.'

"The Department urges enactment of the bill amended as hereinabove recommended."