## THE BERGEN.

No. 6866.

Circuit Court of Appeals, Ninth Circuit.
April 24, 1933.

H. F. Prince and Gibson, Dunn & Crutcher, all of Los Angeles, Cal., for appellant.

Gray, Cary, Ames & Driscoll, of San Diego, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

SAWTELLE, Circuit Judge.

This was a libel in rem brought by appellant against the Bergen to recover the value of supplies furnished that vessel at the request of John E. Heston, who was then the managing owner and agent of the vessel. From the stipulation of facts, it appears that on September 30, 1927, the Bergen was sold to Heston by the Star & Crescent Boat Company, claimant and appellee, and Heston gave appellee a $40,000 purchase-money mortgage to secure the balance of the purchase price. The mortgage contains a provision that "neither the mortgagor nor the master of the vessel shall have any right, power or authority to create, incur or permit to be placed or imposed upon the property subject, or to become subject to this mortgage, any lien whatsoever, other than for crew's wages, wages of stevedores and salvage." The mortgage was recorded in the office of the collector of customs of the port of Los Angeles, the home port of the vessel, and a copy thereof was kept aboard the vessel and indorsed upon the ship's documents. In short, all things necessary to entitle the mortgage to a preferred status were performed as required by subsection D of section 30 of the Merchant Marine Act of 1920, known as the Ship Mortgage Act. 41 Stat. 1000; 46 USCA § 922.

The Bergen was used by Heston as a fishing tender to carry supplies to a number of smaller fishing boats operated by him. During the months of September and October, 1928, appellant, on the order of Heston, furnished the Bergen with oil, gasoline, kerosene, and Diesel fuel, of the value of $2,062, of which $1,287 was used by the Bergen, and the remainder transferred to the fleet of fishing boats. On the trial it was conceded that no lien could be invoked against the Bergen for the value of the supplies transferred to the fishing boats.

Thereafter Heston defaulted in payments

due on the purchase price of the vessel, and, in lieu of foreclosing the mortgage, the Star & Crescent Boat Company, on May 1, 1929, took a bill of sale of the Bergen from Heston, and caused its mortgage to be satisfied of record.

This libel was then brought against the Bergen for the value of the supplies furnished to and used by it. The Star & Crescent Boat Company, claimant, interposed as a defense the above provision of the mortgage prohibiting the creation of a lien against the vessel. It is stipulated that appellant did not have actual knowledge of the existence of the mortgage. The trial court found, however, that appellant had acquired no lien against the Bergen, and dismissed the libel. The Bergen (D. C.) 50 F.(2d) 447, 448.

The decision of the trial court is based on subsections P, Q, and R of section 30 of the Ship Mortgage Act (41 Stat. 1005; 46 USCA §§ 971, 972, 973), which provide, in substance, that any person furnishing repairs, supplies, towage, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by a suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. Subsection R further provides that nothing therein contained shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that, because of the terms of a charter party, agreement for the sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

In dismissing the libel, the trial court said: "It is clear from the foregoing that, if libelant had exercised any diligence whatsoever it would have ascertained that the person ordering the supplies had by his own agreement in the documented and recorded mortgage· precluded himself from making purchases that would operate to attach a lien against the ship or that would be effective in pledging the credit of the ship for the supplies. Common prudence would prompt one supplying merchandise to a ship in a transaction where it is sought to impose a maritime lien upon the vessel, to make some inquiry in the manner provided by statute to ascertain the ability of the person ordering the supplies to pledge the credit of the ship therefor. In this matter there is no evidence that the required diligence or prudence was exercised by the libelant and under such circumstances to hold that it is entitled to a maritime lien would be to render wholly ineffectual and entirely meaningless, the applicable subsection R of Section 30 of the Ship Mortgage Act, 1920 [46 USCA § 973]."

The language of the covenant in the mortgage forbidding the creation of any lien against the vessel is somewhat contradictory. The first sentence of the covenant, above quoted, forbids the creation of any lien whatsoever (except for wages and salvage). The covenant also recognizes, however, that a lien might be created against the ship, for it further provides that: "The mortgagor shall not suffer, nor permit to be continued, any lien, encumbrance, or charge which has, or might have, priority over this mortgage of the vessel to the mortgagee; but in due course, and in any event within fifteen days after the same becomes due and payable or enforceable against the vessel, shall pay, discharge, or make adequate provision for the satisfaction or discharge of all lawful liquidated claims or demands which if unpaid might * * * have such priority over this mortgage, or might operate as a lien, encumbrance or charge upon the vessel, or cause detention in port."

Appellant contends that it acquired a lien. Therefore the first question to be determined is the effect to be given to the covenant of the mortgage whereby the mortgagor, owner of the vessel, agreed that he would have no "right, power or authority to create, incur, or permit to be placed or imposed upon the property subject or to become subject to his mortgage, any lien whatsoever."

Counsel have not cited us to any case wherein the mortgage contained a similar provision. Numerous cases have been cited involving contracts whereby the owner agreed with the mortgagee not to give any paramount security on the vessel, or permit any lien which might have priority over the mortgage. In the case of Morse Drydock Co. v. The Northern Star, 271 U. S. 552, 554, 46 S. Ct. 589, 70 L. Ed. 1082, where a provision of the latter type was involved, the court said: "The owner of course had 'authority to bind the vessel' by virtue of his title without the aid of statute. The only importance of the statute was to get rid of the necessity for a special contract or for evidence that credit was given to the vessel. Subsection R, * * * it is true, after providing that certain officers shall be included among those

presumed to have authority from the owner to create a lien for supplies goes on that 'nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.' But even if this language be construed as dealing with anything more than the authority of a third person to represent the owner so as to create a lien, still when supplies are ordered by the owner the statute does not attempt to forbid a lien simply because the owner has contracted with a mortgagee not to give any paramount security on the ship. The most that such a contract can do is to postpone the claim of a party chargeable with notice of it to that of the mortgagee."

Likewise, in the instant case, we think "the most" that the provision contained in the mortgage can do is to postpone the lien of libelant to that of the holder of the preferred mortgage.

 One who furnishes supplies to a vessel upon the order of the owner thereof is not required to examine the ship's papers or to make inquiry as to the authority of the owner to bind the vessel. Such authority is given him by statute as well as by virtue of his title. To be sure, one who furnishes supplies, etc., to the owner of a vessel is chargeable with notice of a valid preferred mortgage thereon; but, in our opinion, the language used in subsection R deals only with the authority of third persons to represent the owner, and not of the owner himself.

██ It follows that libelant has a valid claim, subject, however, as will hereinafter be seen, to the lien of the preferred mortgage.

At the trial evidence was adduced by both appellant and claimant bearing upon the question of whether claimant had notice of the existence of appellant's claim of lien against the Bergen at the time it accepted from Heston a bill of sale of the vessel and caused the preferred mortgage to be satisfied of record. On this point the trial court found "that it is not true that during said negotiations said claimant was advised by the said John E. Heston of the approximate amount and character of the claim of the libelant herein, or what specific materials and supplies were furnished to respondent; nor is it true that the claimant was advised that the said Heston anticipated that libelant would take action against respondent vessel." Appellant now contends that this finding is contrary to the evidence, and that, "if, at the time claimant satisfied and discharged its mortgage and delivered up the note representing the indebtedness secured thereby, it had actual or constructive knowledge of the facts giving rise to libelant's lien, then the lien of claimant's mortgage ceased to exist and no longer takes priority over libelant's lien."

In this connection but two witnesses testified: Heston, the mortgagor, and Capt. Hall, an officer of the claimant. Heston testified that, in the summer or fall of 1928, when Capt. Hall was soliciting his business, he told Capt. Hall that he was then indebted to appellant in a large amount, and for that reason he could not give claimant any of his business, because, if he did so, appellant would enforce collection of their accounts. He also testified that he told Capt. Hall that all of the boats which he was operating had accounts with appellant. Capt. Hall testified that during this conversation nothing was said with reference to a lien on the Bergen, and that it was in June or July of 1929, after claimant had received the bill of sale of the vessel, that he first learned that appellant claimed a lien for supplies furnished the Bergen during the fall of 1928.

It will be noted that Heston did not fix definitely the date of this conversation with Capt. Hall. He said that it was "in the summer or fall of 1928." The supplies for which this libel was brought were furnished the Bergen in September and October of 1928, and the period testified to by Heston—"in the summer or fall of 1928"—might well have been prior to the latter months. In other words, it may be that at the time of this conversation the supplies had not yet been furnished to the Bergen. It will also be noted that in this conversation Heston made no specific mention of any supplies having been furnished the Bergen. He simply testified that all of the boats which he was operating had accounts with appellant.

Heston further testified that, in January and February of 1929, he told Capt. Hall that the Bergen was responsible for some of his indebtedness to appellant, and that at about the same time he informed Mr. Chandler, another officer of claimant, to the same effect. Capt. Hall testified that he did not remember that anything was said about appellant's claim against the Bergen during these latter conversations. In support of

Captain Hall's testimony, there was introduced in evidence a letter written by him to Mr. Chandler on April 4, 1929, in which he said, in part: "I would like to make it very clear to you, in case we take title to the Bergen, without foreclosing our mortgage, if there should be any liens against the vessel in the way of repairs, supplies, or in fact, any liens whatever, we would be liable for them. I would ask that you be reasonably sure that there are no liens before having title to the vessel recorded in your name. If you think there are any such claims, the best way to do would be to foreclose on the mortgage."

■ It would seem, therefore, that, had claimant any knowledge of appellant's claim against the Bergen, it would have foreclosed its mortgage rather than take a bill of sale of the vessel. In any event, the conclusion to be drawn from the evidence on the question of notice was primarily for the trial judge, and, in view of the conflicting testimony, we are not at liberty to disturb his finding. As said by this court in The Mabel, 61 F.(2d) 537, 540: "Even if we were inclined to differ with the learned trial judge who saw the witnesses, heard their testimony, and had opportunity of passing upon their credibility and accuracy, we would not be warranted in interfering with his findings of fact and conclusions, 'unless the record discloses some plain error of fact, or unless there is a misapplication of some rule of law'" [citing cases]. No such error or misapplication appears in the record.

■ We advance next to the final point of controversy herein, namely, whether, under the circumstances of this case, when a mortgagee formally cancels his mortgage and accepts a bill of sale of the mortgaged property from the mortgagor, the mortgage is merged into the conveyance and no longer takes priority over the junior lien.

The majority rule is thus stated in 39 L. R. A. (N. S.) 839, note (b) (1): "By the weight of authority, a discharge by the mortgagee of his lien and the surrender of the evidence thereof to the mortgagor, in consideration of a conveyance of the interests of the latter to the former, does not operate as an extinguishment of the lien as against junior or intermediate encumbrances, and the senior lien still retains its priority. Different theories to sustain this doctrine are advanced by the cases, but with few exceptions they all reach this result."

In 41 C. J. 779, the following language is found: "A merger will not be held to result wherever a denial of a merger is necessary to protect the interests of the mortgagee, the presumption being, in the absence of proof to the contrary, that he intended to do what would best accord with his interests. On this ground a merger has been denied even where the conveyance was admittedly made in satisfaction and cancellation of the indebtedness, or where the mortgagee took the conveyance under the mistaken belief that a merger would result but with no desire or agreement on his part to bring it about."

At pages 775, 776 of the same volume it is stated: "Furthermore, a merger will not be allowed where it would work injustice or violate well established principles of equity or the intention of the parties."

The leading federal decision on this subject is Factors' & Traders' Insurance Company v. Murphy, 111 U. S. 738, 743–744, 4 S. Ct. 679, 681, 28 L. Ed. 582, where the court said: "So far as the doctrine of confusion of the Louisiana Code may be said to be the equivalent of the doctrine of merger, in the common law and in equity, in the latter it has been uniformly held that where an incumbrancer, by mortgage or otherwise, becomes the owner of the legal title or of the equity of redemption, the merger will not be held to take place if it be apparent that it was not the intention of the owner, or if in the absence of any intention said merger was against his manifest interest."

In the instant case, the efforts made by the claimant and appellee to ascertain whether there were any liens against the boat, and the importance it attached to the question of liens—quite apart from the question as to whether adequate inquiry was made—clearly show that the claimant had no "intention" of permitting such a merger to take place.

The effect of an "intervening right"—in this case the appellant's junior lien—as preventing a merger was clearly recognized by the Supreme Court in United States v. Stowell, 133 U. S. 1, 19, 10 S. Ct. 244, 33 L. Ed. 555. The Factors' Case, supra, was there cited with approval, although the facts in the Stowell Case differed from those of the Factors' Case, just as the facts in the instant case in turn differ from the facts in either of those controversies.

In Guaranty Trust Co. v. Minneapolis & St. L. R. Co. (C. C. A. 8) 36 F.(2d) 747, 764 (nine appeals) certiorari denied, 281 U. S. 756, 50 S. Ct. 407, 74 L. Ed. 1166, the court observed: "It is said to be a general rule that the acquisition of the equity of redemp-

tion in mortgaged premises by the mortgagee results in a merger of the two estates, vesting the mortgagee with the complete title and putting an end to his right or title under the mortgage. But this general rule as to merger has so many exceptions and modifications that to call the rule a general one is almost a misnomer. Merger is dependent almost entirely upon the intent of the parties, particularly the intent of the mortgagee, and courts of equity are loath to declare a merger unless such result is the manifest intention of the parties to the transaction. [Many cases cited.]"

See, also, Case v. Fant (C. C. A. 8) 53 F. 41, 43; McDaniel v. Stroud (C. C. A. 4) 106 F. 486, 490; Barnes v. Cady (C. C. A. 6) 232 F. 318, 326, 327; Hartford Accident & Indemnity Co. v. Federal Bond & M. Co. (C. C. A. 8) 59 F.(2d) 950, 956.

The rule in California is in harmony with that of the majority. In 18 Cal. Jur. §§ 390, 391, pp. 76, 77, the doctrine is thus stated: "Indeed, it is presumed as a matter of law that the party must have intended to keep on foot his mortgage title when it is essential to his security against an intervening title or for other purposes of security; and this presumption arises although the parties, through ignorance of such intervening title or through inadvertence, have actually discharged the mortgage and cancelled the notes with the intention to extinguish them."

Since, as we have seen, the mortgagee had no intention of merging its equitable with its legal title to the boat, but was, on the contrary, anxious to preserve a seniority of lien, we are of the opinion that there was no merger of title, and that the preferred mortgage continued in full force and effect as against intervening lienors, of whom the mortgagee had no knowledge.

From our observations regarding the validity of the appellant's lien, it follows that the final decree of the court below must be reversed, and the case remanded, with instructions that the oil screw Bergen, her engines, etc., be sold under order of the District Court, the proceeds deposited into the registry of the court, and the following final disposition to be made thereof:

(1) The claimant-appellee's mortgage lien to be satisfied first, as a preferred claim.

(2) The libelant-appellant's junior lien to be satisfied, in whole or in part, out of the residuum, if any.

(3) If, after these two liens have been satisfied, there is a residuum, it shall be paid over to the claimant-appellee, as holder of the legal title.

(4) Each party shall bear its own costs in this court and in the court below; any further costs incurred shall be paid out of the proceeds of the sale of the vessel.

Reversed and remanded, with instructions.