**1196**

STATE OF ISRAEL, a sovereign nation, Plaintiff,

v.

The MOTOR VESSEL NILI, of Israeli Registry No. MS-169, her engines, machinery, tackle, apparel, masts, boats, furniture, and all other necessaries thereunto appertaining and belonging, and Nili Somerfin Car Ferries, Limited, an Israeli corporation, Defendants.*
No. 66-1329-Civ-CA.

United States District Court,
S. D. Florida,
Miami Division.

Oct. 18, 1968.

---

* Consolidated with the following cases: Nos. 66-1313-Civ-CA, 66-1340-Civ-CA, 66-1370-Civ-CA, 66-1374-Civ-CA, 66- 1391-Civ-CA, 66-1420-Civ-CA, 66-1489-Civ-CA.

Richard F. Ralph, Miami, Fla., for State of Israel.

Irving M. Wolff, Miami, Fla., for Nili-Somerfin Car Ferries Limited.

Heiman & Heiman, Miami, Fla., for T. Arison Co.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ATKINS, District Judge.

This order grants in part and denies in part the motions for summary judgment filed by the State of Israel and the Intervenor Dade Trading Corp.

## I FACTS

On December 17, 1963, the Nili-Somerfin Car Ferries Limited [1] (hereinafter Owner-Mortgagor) contracted [2] with the Fairfield Shipbuilding & Engineering Company Limited of Govan, Glasgow, Scotland (hereinafter Builder) for construction of the vessel involved here (hereinafter Nili). The agreement provided for 20 per cent payment of the vessel's purchase price during construction and 80 per cent payment of the purchase price on delivery.

[1.] A company incorporated under the laws of the State of Israel and having its registered office at 98 Haatzmouth Road, Haifa in the State of Israel.

[2.] This agreement was modified by an addendum dated August 11, 1964 which is not material to the present litigation.

On October 14, 1964 the Owner-Mortgagor signed a financing agreement with the Bank of Scotland (hereinafter the Bank). Under this financing agreement the Bank was to loan 2,078,400 pounds sterling to the Owner-Mortgagor. This amount covered the 80 per cent payment of the purchase price due on the vessel's delivery. The financing agreement provided that within fifteen days the Owner-Mortgagor would obtain a letter from the State of Israel (hereinafter Israel) promising Israel's execution of a guarantee for the due repayment of the 2,078,400 pounds sterling. Within fifteen days Israel agreed to execute the requested guarantee; the guarantee to be executed upon the Owner-Mortgagor's receipt of the vessel. The Bank in turn was committed to advance the funds only after: (1) delivery of the Nili, (2) its registry at a port in Israel in the name of the Owner-Mortgagor, and (3) the issuance of the guarantee by Israel.

On May 25, 1965 Israel and the Owner-Mortgagor executed a contract of Guarantee.[3] This Contract required the Owner-Mortgagor to do two things upon delivery of the Nili: (1) register the vessel in the Israeli Register of Vessels and (2) register a first mortgage on the vessel in favor of Israel. To assure the performance of these duties the Owner-Mortgagor delivered to Israel a power of attorney.[4]

On June 8, 1965 Israel issued its Guarantee to the Bank [5]. This Guarantee, which was contingent upon delivery of the Nili, assured the repayment of a series of 60 notes that were to be executed by the Owner-Mortgagor to the Bank upon delivery of the Nili. The notes guaranteed represented the 80 per cent payment of the purchase price and interest on this amount.

[3.] Exhibit D–1 and D–2 with Israel's motion for summary judgment.

[4.] Exhibit F–1 and F–2 with Israel's motion for summary judgment.

[5.] Exhibit H–1 and H–2 with Israel's motion for summary judgment.

On June 12, 1965 the Nili was delivered to the Owner-Mortgagor; the vessel was registered in Israel; the first mortgage was executed and registered in Israel; and the promissory notes were executed and delivered.

On December 12, 1965, promissory note number 31 came due and was paid by the Owner-Mortgagor. Two more promissory notes came due on June 12, 1966. On June 14, 1966 Israel was notified by the Bank that the notes were not paid. On June 21 the Bank demanded that Israel pay the notes as required under the Guarantee. Israel complied with that demand. On June 30, Israel demanded repayment from the Owner-Mortgagor for the amount Israel had paid under the Guarantee. On November 8, 1966 Israel again demanded repayment of the amounts paid under the Guarantee and in addition elected under clause 13A of the mortgage deed to accelerate the debt.[6]

On November 17, 1966 Israel filed this action to foreclose its mortgage. This Court ordered the vessel sold on December 29, 1966 and on January 30, 1967 the United States Marshal sold the vessel to the State of Israel for $4,200,000.00.

In addition to the claim of Israel, $885,500.21 in other claims have been filed against the vessel. Of these claims $76,349.21 worth were either settled or dismissed leaving $809,151 in claims against the vessel not including the $8,-014,644.00 claim of Israel under its mortgage. At this point in the litigation the validity and amount of these claims have not been determined. But to put the case in a proper context, a very rough classification of this $809,151 in claims is helpful.[7] There are approximately $82,-000 in claims for personal injury and maintenance and cure. Another $275,-000 of the claims fall within the proviso clause of 46 U.S.C. § 951—that is, are claims for necessaries and supplies furnished to the vessel in the United States. The remaining $451,000 in claims represent a great variety of claims which can only be described in the negative as claims probably not falling within the proviso language of 46 U.S.C. § 951.

## II THE QUESTIONS PRESENTED

The motions for summary judgment raise two legal questions. First, is the mortgage valid and enforceable in this court? Second, is the mortgage's lien preclusionary clause valid and effective?

## III. THE VALIDITY OF THE MORTGAGE

The State of Israel seeks to foreclose its mortgage under 46 U.S.C. § 951 which gives this Court jurisdiction to foreclose certain foreign ship mortgages that are "preferred mortgages" within the meaning of the statute.

Throughout this lengthy litigation numerous objections have been made to the validity of the mortgage and this Court's jurisdiction to foreclose that mortgage. A hearing on May 29, 1968 materially clarified and limited these objections. At that hearing the lienors conceded the proper registration and recordation of Israel's mortgage.[8] The lienors did urge four other objections to the validity of the mortgage.

---

6. The Owner-Mortgagor has never paid any of these demanded amounts to Israel. Affidavit of E. Landau, Exhibit 17 with Israel's motion for summary judgment. The Owner-Mortgagor also defaulted on certain mortgage requirements concerning insurance coverage of the Nili.

7. This is indeed a rough classification. Many of the claims are highly complex and involve difficult factual and legal questions.

8. This concession solves any problem that may arise under the following italicized language of § 951:

[T]he term 'preferred mortgage' shall include * * * any mortgage, hypothecation, or similar charge * * * if such mortgage, hypothecation, or similar charge * * * *has been duly registered in accordance with such laws* [laws of the country of the vessels documentation] *in a public register either at the port of registry of the vessel or at a central office;* * * *

## A. Acceleration of the Secured Debt

 The lienors argue that there never was an acceleration of the secured debt and at most Israel can only recover amounts actually paid under the Guarantee to the Bank. Exhibit 10 attached to Israel's motion for summary judgment clearly answers this objection. Exhibit 10 is a letter from the Accountant General of Israel to the Owner-Mortgagor dated November 8, 1966. In this letter Israel notified the Owner-Mortgagor of Israel's election under clause 13A of the mortgage[9] (the acceleration clause) to demand the full sum of the remaining indebtedness. This was certainly sufficient to accelerate the indebtedness. In addition, in the complaint, Israel again demands and declares the whole of the guaranteed amounts as due.[10]

The record clearly shows the acceleration of the secured debt.

## B. Authority of Israel to Guarantee the Debt of a Private Corporation

 The lienors also argue there is no showing of Israel's authority to guarantee the debt of a private corporation. Thus, both the guarantee and the mortgage arising out of it are ultra vires and of no effect.

The record contains evidence of Israel's authority to guarantee this private debt. The Guarantee attached to the Complaint as Exhibit II and executed by the Minister of Finance of Israel recites his power and authority to execute the guarantee and refers to explicit enabling legislation.[11] The Complaint alleges that the Guarantee was duly executed and delivered and that the mortgage was "duly and validly executed in accordance with the laws of the State of Israel."[12] The Complaint is sworn to by the Accountant General of Israel (Dov-Ben Dror) in a separate affidavit.[13] In addition, the Legal Advisor to the Ministry of Finance of the State of Israel, Elhanon Landau, recites in an affidavit that "the Ship's Mortgage Deed and the documents attached thereto * * * were duly and validly executed and duly registered in accordance with the applicable law of the State of Israel."[14] A careful study of the voluminous documents submitted in support of Israel's motion for summary judgment proves the authority of Israel to execute this guarantee. The whole history—documentary and factually—of this case shows that a major foundation of these transactions was the power of Israel to execute the guarantee here in question. In light of this factual and documentary background the affidavits and the complaint take on an added evidentiary significance.

In the face of this evidence supporting Israel's authority to guarantee the Owner-Mortgagor's private debt, the lienors boldly raise the general and unsupported objection that there is no such authority. This objection fails for two reasons. First, the objection is insufficient under Federal Rule 56(e). Israel has supplied affidavits and comprehensive, detailed documents tending to show its authority to execute the guarantee. The lienors have supplied nothing. Rule 56(e) places a burden on the lienors; they have not met it.

The second reason the objection fails is the presumption of regularity of a pub-

---

9. The mortgage is attached to the complaint as Exhibit I and to the motion for summary judgment as Exhibit B-1 and B-2.

10. Paragraph 14 of the Complaint.

11. The Guarantee on page 2 reads: "[I], the Minister of Finance of the Government of Israel, acting on behalf of the State of Israel by virtue of the powers conferred upon me by the State Guaran-

tees Law 5718–1958 and with the approval of the Finance Committee of the Kenesset, DO HEREBY GUARANTEE. * * * "

12. Paragraphs 6 and 11 of the Complaint.

13. This affidavit was filed on February 15, 1967.

14. Exhibit 15 with Israel's motion for summary judgment.

**1200**

lic officer's official acts.[15] This presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.[16] This presumption applies to the acts of foreign officials as well as American.[17] No evidence was offered by the lienors to overcome this legal presumption in favor of Israel's official acts and thus the presumption stands unrebutted.

For the above reasons, I find that the State of Israel had authority to guarantee the Owner-Mortgagor's private debt.

### C. Is the Lien of the Mortgage a Maritime Lien?

■■ The lienor's third objection is based on the fact that the debt secured here was a shipbuilding loan. The lienors argue that the guarantee and mortgage grew out of the shipbuilding loan and can be in no better position than the loan. Since a shipbuilding contract under American admiralty law does not create a maritime lien, the lienors argue that the lien of Israel's mortgage is not a maritime lien. This objection is based on three unstated assumptions: (1) that the normal admiralty rule concerning shipbuilding contracts applies to the lien of a preferred ship's mortgage under the Ship Mortgage Act,[18] (2) that American admiralty law controls in classifying Israel's mortgage lien as maritime or nonmaritime, and (3) that the Israeli mortgage lien must have maritime status in order to be treated as a preferred mortgage lien under the Ship Mortgage Act. The first two assumptions are false and the objection must therefore fail.

Detroit Trust Co. v. "Thomas Barlum"[19] scuttles the first assumption. In that case the Supreme Court held that the maritime status of the preferred mortgage lien was conferred by the statute and was not controlled by the actual use of the funds secured by the mortgage. But this negation of the first assumption becomes unimportant in light of my refusal to accept the second assumption concerning the choice of the applicable law. Section 951 of 46 U.S.C. states in part:

> [T]he term "preferred mortgage" shall include * * * any mortgage, hypothecation, or similar charge created as security upon any documented foreign vessel * * * if such mortgage, hypothecation, or similar charge has been *duly and validly executed in accordance with the laws of the foreign nation* under the laws of which the vessel is documented and has been duly registered in accordance with such laws * * * (emphasis added).

The language of § 951 clearly requires application of Israeli law in construing and interpreting Israel's mortgage. The second assumption must therefore fail.

■■ The decision to apply Israeli law brings me to the third assumption which is now better stated in the form of a question: Must the Israeli mortgage have maritime lien status under Israeli law in order to be treated as a preferred mortgage under the Ship Mortgage Act? A negative answer is preferable since it is a literal interpretation of § 951. Section 951 contains no requirement that the "mortgage, hypothecation, or similar charge" have maritime lien status under the foreign

---

15. The same reasons that warrant the use of presumptions at trial warrant their use in a motion for summary judgment. Becker v. Safelite Glass Corp., 244 F.Supp. 625 (D.Kan.1965); 6 J. Moore, Federal Practice ¶ 56.11 [10] (2d ed. 1953).

16. United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). See also Sabin v. United States, 44 F.2d 70, 70 Ct.Cl. 574 (1930).

17. United States v. King, 44 U.S. (3 How.) 773, 785–786, 11 L.Ed. 824 (1845); Boissonnas v. Acheson, 101 F.Supp. 138 (S.D.N.Y.1951).

18. Originally passed in 1920 and now codified as 46 U.S.C. §§ 911–984.

19. 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934).

law. The statutory language "or similar charge" is broad enough to encompass foreign mortgages of non-maritime lien status.

While a negative answer is preferable, for the sake of completeness I will assume the opposite.[20] A positive answer requires the foreign mortgage to have maritime lien status in the country of documentation. This answer requires analysis of Israeli law.

Israel's Shipping (Vessels) Law, 5720–1960 [21] enjoys a clarity and completeness which perhaps can only be achieved in a new country where the drafters are not troubled by hoary legal precedents or haunted by the traditions of a long past era. Section 55 of Chapter 5 of the Israeli Law reads in part:[22]

> The owner of a vessel registered under this law or the owner of a share in a vessel * * * may mortgage his right in the vessel as security for an existing, future or contingent liability by the drawing up of a mortgage deed and its registration under this law.

Section 72 of Chapter 5 states in part:[23]

> Where any of the conditions of the mortgage deed the nonfulfillment of which confers the right of realization has not been fulfilled, the mortgagee may institute before the court [the maritime Court] an action in rem for the realization of the mortgage, and in such an action the court may (1) make an order for the sale of the vessel or the mortgaged share * * *

There is nothing in these sections which prohibits securing a shipbuilding loan by a mortgage. The language of Section 55 is clearly broad enough to cover such a mortgage. In addition, a close scrutiny of other statutory provisions reveals that this type of mortgage was clearly con-

templated and intended by the statute. Section 4 of Chapter 2 deals with registration of vessels and reads:[24]

> A vessel under construction in Israel or abroad which fulfills the conditions of eligibility mentioned in Section 2 [a vessel more than half of which is owned by an Israeli corporation is eligible for registration] * * * may be registered * * * and upon being so registered it shall be deemed to be a vessel unless the contrary intention appears.

As pointed out, Section 55 of Chapter 5 allows "the owner of a *vessel registered under this Law*" (emphasis added) to mortgage his right in the vessel. Considering Sections 4 and 55 together it is clear that the statute allows a vessel under construction to be registered and mortgaged. These provisions clearly intended to allow a shipbuilding loan to be secured by a maritime mortgage on the vessel while it is still under construction. Considering the statute as a whole it is clear that the instant mortgage has maritime lien status under the laws of Israel.

In conclusion, the lienor's third objection fails because Israeli law, not American law, controls the classification of this mortgage. Further, the objection fails because there is no requirement in § 951 that the foreign mortgage be maritime in status. And finally, even if there was a requirement of maritime status, this requirement is met since the instant mortgage is clearly of maritime lien status under Israeli law.

**D. Does This Court Have Jurisdiction To Foreclose a Foreign Ship Mortgage Held by a Foreign Mortgagee?**

This lienors' final objection is that this Court does not have jurisdic-

**20.** These two possible answers are discussed in G. Gilmore & C. Black, Admiralty, § 9–51 p. 578 (1957).

**21.** Passed by the Kenesset on the 11th Av., 5720 (August 4, 1960), and published in Sefer Ha-Chukkim No. 315 of the 21st Av., 5720 (August 14, 1960), p. 70; the Bill and an Explanatory note were published in Hatza ot Chok No. 392 of 5720, p. 338.

**22.** Laws of the State of Israel, Vol. 14, 5720–1960 p. 72, [Hereinafter Laws of Israel].

**23.** Laws of Israel, p. 76.

**24.** Laws of Israel, p. 61.

tion to foreclose this mortgage. There is no question that an *American Mortgagee* can foreclose his mortgage under § 951. But the lienors argue that a *foreign mortgagee* cannot use § 951 to foreclose his mortgage.

The statutory language of the 1954 Amendment contains no requirement that the mortgagee be a United States citizen.[25] The lack of such a requirement takes on added significance when the statutory history is considered. The Ship Mortgage Act of 1920 limited preferred mortgages to mortgages held by American mortgagees. 46 U.S.C. § 922 (a) (5) explicitly required the mortgagee to be a United States citizen. But the 1954 amendment to § 951 does not mention the mortgagee's nationality in defining the new class of preferred ship mortgages. Considering the two statutory provisions together, the clear inference is that the deletion of a citizenship requirement in the 1954 amendment was intentional.

A study of the policy considerations before Congress shows that foreign mortgagees are within the statute. The primary concern of Congress in enacting the amendment was to provide the United States government with an efficient method for enforcing its mortgages on foreign vessels.[26] These mortgages resulted from the United States government's sale of surplus World War II vessels. But Congress was also concerned with the international ramifications of amendment.[27] The hearings show Congress's sympathy with international attempts toward uniformity in establishing a suitable forum for the enforcement of all properly executed and registered mortgages regardless of the mortgagee's nationality.[28]

Finally, and most importantly, the Fifth Circuit has clearly held foreign mortgagees within the statute.[29]

Considering the judicial authority, the clear statutory language, and the legislative history, Israel can foreclose its mortgage under § 951.

---

25. For a clear statement of this view of the statute see Rederiaktierbolaget v. Compania de Navegacion, 139 F.Supp. 327, 336 (Canal Zone 1955).

26. At the time of the amendment the United States government had outstanding 371 of these mortgages totaling $116,870,476.33. Hearings on H.R. 6276 Before the Committee on Merchant Marine and Fisheries, 83rd Cong. 2d Sess., 11 (1954) [Hereinafter Hearings on H.R. 6276].

27. Mr. Prizer of the Maritime Association of the United States in testifying before the House Committee stated:

> There is an international phase of this, too. We have been working with foreign associations for several years to obtain, insofar as possible, uniformity in other countries. There are foreign countries today which will enforce foreign ship mortgages, not only for their own citizens but for other citizens, too. Other countries, particularly Great Britain, do not. Great Britain's law, for all practical purposes, is similar to our own now. But the secretary of the English Maritime Law Association has had the matter up, as I understand, before members of the judiciary

> before whom justice bills originate, and then there is a strong indication if our bill has passed we will get a similar result in Great Britain, which would be very beneficial to the United States Government and American mortgages in that if vessels could not be found in this country and could be found in England, there would be a remedy there.

Hearings on H.R. 6276 at 5. See also S.Rep.No.1219, 83rd Cong., 2d Sess. 5 (1954).

28. This view is expressed in Rederiaktierbolaget v. Compania de Navegacion, 139 F.Supp. 327, 336 (Canal Zone 1955). A further indication of the "international phase" of the amendment is that except for the proviso, and the lists of types of vessels excluded the amendment copies Article I of the Brussels Convention of 1926 for the Unification of Certain Rules of Law Relating to Maritime Liens and Mortgages. An English translation of the convention is contained in 6 A. Knauth, Benedict on Admiralty 383 (1958).

29. Tropicana Shipping, S. A. v. Empresa Nacional "Elcano", 366 F.2d 729 (5th Cir. 1966),; Brandon v. S. S. Denton, 302 F.2d 404 (5th Cir. 1962).

## IV THE VALIDITY OF THE LIEN PRECLUSIONARY CLAUSE

Having found Israel's mortgage to be a preferred foreign ship mortgage within the meaning of § 951, the next question is the validity and effect of the mortgage's lien preclusionary clause. An effective lien preclusionary clause would not alter the priority of the approximately $82,000 in tort and maintenance and cure claims.[30] Neither would a valid lien preclusionary clause affect the status of most of the foreign maritime lienors. These foreign lienors are defeated by the preferred status of Israel's mortgage. Since most of these foreign maritime claims cannot qualify under § 953(a) (2) as preferred maritime liens they are subordinate to the mortgage lien. The mortgage lien is over 8 million; the fund is only 4.2 million. The result is that any liens subordinate to the mortgage will share in a non-existent fund. Thus, the foreign lienors are defeated by their subordination to the mortgage regardless of the lien preclusionary clause's effect.[31]

The real battle over the lien preclusionary clause's effectiveness is between American maritime lienors and Israel. Recognizing the fate of any claim which is subordinate to Israel's mortgage, the American lienors argue strongly that their liens (approximately $275,000) are prior to the preferred mortgage by operation of the proviso of § 951. This proviso reads:

> *Provided, however,* that such "preferred mortgage lien" in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States.

Israel responds to the American lienors reliance on this proviso by arguing that the lien preclusionary clause relegates all suppliers' liens to a non-maritime status and thus subordinates them to the mortgage.

The lien preclusionary clause here in question appears in paragraph 5(d) of the mortgage:

> The mortgagor hereby undertakes: (d) subject to the provision of this clause, not sell or encumber the vessel temporarily or permanently * * *.

Equally important in this case is paragraph 5(f) of the mortgage:

> The mortgagor hereby undertakes: (f) To exhibit in prominent form on one of the walls of the map room and in the captain's cabin in the vessel a printed notice in Hebrew and English stating that on this vessel a first mortgage has been granted in favor of the State of Israel, in accordance with the Shipping (Vessels) Law 5720–1960 of the State of Israel, and that under the terms of this mortgage the owner, employees of the vessel or their representatives have no right to create, grant or allow any encumbrance whatsoever on this vessel, and to keep such notice exhibited as aforesaid at all times.

The above notice was posted as required at all times.[32] The Nili's Captain testified that no one ever inquired regarding a mortgage or looked for notices on the bridge.[33]

### A. Israel's Argument in Favor of the Lien Preclusionary Clause's Validity

There are three steps in Israel's argument supporting the lien preclusionary clause. The first step rests heavily on 46 U.S.C. § 973 which provides:

> The officers and agents of a vessel specified in Section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of

---

30. This follows because of 46 U.S.C. § 953 (a) (2).

31. Foreign lienors who could qualify under § 953(a) (2) would not be subordinate to

the mortgage but would have priority because of § 953(b).

32. Captain Radan's deposition p. 4, 9, 13.

33. *Id.* at 17–18.

the vessel; *but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies or other necessaries was without authority to bind the vessel therefor.* (Emphasis added.)

Israel argues that the words "or for any other reason" are broad enough to encompass a lien preclusionary clause contained in a foreign ship mortgage. Israel further argues that posting the notice required by paragraph 5(f) of the mortgage was sufficient notice to potential lienors under the notice requirement of § 973. In short, Israel argues that its lien preclusionary clause is sanctioned by § 973.

Having argued the validity of its lien preclusionary clause, Israel argues as a second step that as a mortgagee it can invoke the protection of § 973 and thus relegate the liens of American suppliers to a non-maritime status.[34] Thus, these American suppliers are not simply subordinated to the mortgage lien—they are relegated to a completely non-maritime status.

Finally, as a third step, Israel points out that relegation of the American suppliers' liens to non-maritime status

avoids any problem with the proviso of § 951. If the American suppliers had maritime liens then the proviso of § 951 would elevate these liens above its preferred mortgage. But Israel argues that since these American suppliers have only non-maritime liens they cannot take advantage of the proviso.

B. The Inability of the Lien Preclusionary Clause to Change the Proviso of the 1954 Amendment to § 951.

(1) *The 1954 Amendment to § 951—a conditional grant of jurisdiction.*

Israel's argument for the lien preclusionary clause's effectiveness fails for a number of reasons. The primary reason is the clear intent of Congress in passing the 1954 Amendment to § 951.

Prior to 1954, the Ship Mortgage Act did not allow the foreclosure of foreign ship mortgages. In 1954, § 951 of the Ship Mortgage Act was amended by adding the second paragraph of § 951. This amendment was a jurisdictional amendment to allow certain qualifying foreign ship mortgages to be foreclosed under the Act. But the increase in jurisdiction was accompanied by a proviso that subordinated preferred foreign ship mortgage liens to maritime liens for supplies furnished in the United States. The reports of both the Senate and the House reflect the importance of this proviso.[35] These Congressional reports, the

34. See Pascagoula Dock Station v. Merchants and Marine Bank, 271 F.2d 53 (5th Cir. 1959); Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 261 F.2d 861 (5th Cir. 1958). *Contra,* The Bergen, 64 F.2d 877 (9th Cir. 1933) reversing, 50 F.2d 447 (S.D.Cal.1931); The Tradewind, 144 F.Supp. 408, 413–414 (D.Md.1956).

35. The House report contained a letter from Secretary of Interior Sinclair Weeks which stated:

While thus providing a forum on the admiralty side of the United States courts in the enforcement of defaulted foreign mortgages, the bill does not give these foreign ship mortgages the same order of priority over subsequent repair and other liens given under existing

United States laws to preferred ship mortgages on United States flag vessels. A proviso at the end of the bill provides that, in case of mortgages on foreign vessels, the mortgage lien shall be subordinated to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries. Under existing United States law, preferred mortgage liens on United States flag vessels come ahead of maritime liens for repairs, supplies, and necessaries furnished subsequent to the mortgage liens. On the other hand, the bill improves the position of the holder of a mortgage on a foreign vessel, for under existing United States law he may only foreclose in an equity proceeding in the United States court and in such

history of the 1954 Amendment, and the clear language of the proviso point out that the amendment was intended as "a conditional grant of jurisdiction." In essence, the amendment stated: District Courts can now foreclose preferred foreign ship mortgages *provided* the liens of such mortgages shall be subordinate to the maritime liens of American suppliers.

The State of Israel attempts to defeat this clear Congressional purpose by some very sophisticated reasoning. Israel first enters the Ship Mortgage Act through the 1954 Amendment to § 951. (Initially, Israel ignores § 951's proviso). Having entered the Act, Israel seizes upon § 973 and asserts a valid lien preclusionary clause based on this section. Then, armed with the lien preclusionary clause Israel returns to § 951 and nullifies the 1954 Amendment's proviso. Thus, Israel accomplishes exactly what Congress intended *not* to happen.

Israel is only in this court because of the 1954 Amendment. To gain admittance Israel must recognize the substantive limitation on its rights contained in the 1954 Amendment's proviso. Israel cannot use the 1954 Amendment to gain the benefits of the statute which are then in turn used to destroy the limitation contained in the 1954 Amendment.

(2) *The application of Morse Dry Dock v. The Northern Star.*

Assuming Israel is correct in Step 1 of its argument that § 973 sanctions the use of a lien preclusionary clause in a maritime mortgage,[36] Israel's argument is still fatally defective in Step 2. The second step asserts that a mortgage lien preclusionary clause in conjunction with § 973 can relegate the liens of American suppliers to a non-maritime status. This assertion founders on the principle that maritime liens for supplies ordered by the owner of a vessel cannot be relegated to non-maritime status by a lien preclusionary clause in a mortgage.[37]

The above mentioned principle concerning the effect of a mortgage's lien preclusionary clause was first stated by the Supreme Court in Morse Dry Dock, etc. v. The Northern Star.[38] In construing § 973 the Court stated:[39]

> When supplies are ordered by the owner the statute [§ 973] does not attempt to forbid a lien simply because the owner has contracted with a mortgagee not to give any paramount securities on the ship.

case the mortgage lien is subordinate to all maritime liens.

\* \* \* Thus, while the bill does not give the holder of a mortgage on a foreign vessel the same preference or priorities as the holder of a mortgage on a United States vessel, it provides him an expeditious foreclosure proceeding and takes away no procedural or substantive right which he now has.

H.R.Rep. No. 6276, 83rd Cong., 2d Sess., 2–3 (1954).

The Senate Report contained a letter from Attorney General William P. Rogers which stated:

The proviso in the bill, subordinating the mortgage lien in the case of foreign vessels to the liens of suppliers, appears to have been written to meet the objection of drydock and repair yard owners in the United States. They assert that in the short time available in their business, their facilities for discovering the existence of a foreign ship mortgage are not adequate as is the case with American-flag vessels. They ask, therefore, that their liens for repairs, supplies, towage, use of drydocks, or marine railway, or other necessaries, should be prior to the mortgagee's claim where mortgages of foreign ships are involved. S.Rep. No. 1219, 83rd Cong., 2d Sess. 3–4 (1954).

36. This assumption is probably incorrect. Judge Watkins in The Tradewind, 144 F.Supp. 408, 416–417 (D.C.Md.1956) carefully traces the history of § 973 in relation to other provisions of the Ship Mortgage Act to show that § 973 was not intended to include a preferred ship mortgage.

37. The maritime supplies in the instant case were ordered by the owner or his admitted agent.

38. 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1926) (hereinafter *The Northern Star*).

39. *Id.* at 554, 46 S.Ct. at 590.

The Supreme Court's holding in *Northern Star* has been criticized as dictum.[40] But a close analysis of the case proves otherwise. In *The Northern Star* the Supreme Court faced a conflict between an American ship mortgage containing a lien preclusionary clause and an American supplier's lien. The Court first held the ship mortgage valid because it conformed to § 921. Then, the Court was faced with the mortgage's lien preclusionary clause. The Court disposed of the contention that the clause could destroy maritime liens by the above quoted holding. After holding the maritime supplier's lien existed the Court had to decide which lien was prior—the supplier's lien or the ship mortgage lien. The Court held the supplier's liens prior because § 922(a) (1) was not satisfied and thus the mortgage lien never gained the priority of a "preferred" mortgage lien conferred by § 953. Thus, the Court's holding on the effect of the lien preclusionary clause was an integral and necessary step leading to the final decision on priority. If the supplier's lien had been destroyed by the lien preclusionary clause the Court would· have never troubled itself with which lien was prior.

Despite some initial criticism of *The Northern Star* holding as dicta the case has been followed.[41] In addition to judicial acceptance, the reasoning behind the decision also warrants its acceptance. This reasoning is that § 973 is for the benefit of the owner. Section 973 protects the owner against third persons not authorized to procure supplies for the vessel. The mortgagee does not need the protection of § 973 because his preferred mortgage puts him ahead of maritime suppliers' liens regardless of the authority of the person who orders the supplies. Thus, since § 973 is not needed by the mortgagee, *The Northern Star* held that the mortgagee could not assert it to destroy the maritime status of suppliers' liens.[42] Additionally, there is a strong policy reason for this result. Permitting the creation of maritime liens subordinate to, and without waiving the preferred status of the mortgage lien protects the security of the mortgagee since it keeps the vessel in operation and generating income.

There is brief comment in two decisions of the Fifth Circuit which seem to say that a mortgage lien preclusionary clause coupled with sufficient notice are together capable of destroying the maritime status of suppliers' liens.[43] These

40. The Bergen, 50 F.2d 447, 448 (D.C.Cal. 1931), reversed, 64 F.2d 877 (9th Cir. 1933).

41. International Refugee Organization v. Maryland Drydock Co., 179 F.2d 284 (4th Cir. 1950) ; The Bergen, 64 F.2d 877 (9th Cir. 1933) reversing, 50 F.2d 447 (S.D.Cal.1931) ; Rockport Yacht & Supply Co. v. M/V Contessa, 209 F.Supp. 396 (D.C.Tex.1962) ; The Tradewind, 144 F.Supp. 408 (D.C.Md.1956).

42. The Northern Star principle is also necessary to maintain an internal consistency within the Ship Mortgage Act. In discussing this point in The Tradewind, 144 F.Supp. 408, 418, 419 (D.C. Md.1956) Judge Watkins states:

Accordingly, this court holds that Section 973 was enacted and re-enacted as an exception in favor of the vessel owner and deals only with the authority of a third person to represent the owner so as to create a lien. It does not pre-

vent the *creation of a lien* as such (the status of the lien being another matter) against the vessel by an owner in favor of a supplier irrespective of the prohibitory terms of any mortgage covenant made by the owner to the mortgagee. To hold otherwise would be to nullify the effect of other provisions of the Ship Mortgage Act, 1920, in that a ship's mortgage which failed to comply with the procedural requirements of the Act, necessary to achieve the status of a preferred mortgage, could nevertheless not only gain priority over the supplier's claim but would relegate it to a non-maritime status where the supplier knew, or with due diligence could have learned, of the terms of the mortgage.

43. In Pascagoula Dock Station v. Merchants and Marine Bank, 271 F.2d 53, 55 (5th Cir. 1959), Judge Brown in speaking for the Court stated:
A printed or written notice in the wheelhouse or some other obvious place is, of

two cases are strongly urged by Israel in support of the second step in its argument. Israel points out that the type of notice suggested as sufficient by these two cases is precisely the notice given here by the requirement of paragraph 5 (f) of the mortgage. These Fifth Circuit cases are not controlling for three reasons. First, the comments are dicta. Second, both of these cases involve American mortgages on American vessels while the instant case involves a foreign vessel. There is clearly a difference in Congressional policy concerning foreign ship mortgages.[44] The third reason is the Supreme Court's reasoning in *The Northern Star*. After holding that a mortgage lien preclusionary clause could not destroy the maritime status of a supplier's lien the Court in *The Northern Star* went on to say:[45]

> The most such a contract [a mortgage lien preclusionary clause] can do is to postpone the claims of a party *chargeable with notice of it* to that of the mortgagee. (Emphasis added)

Thus, even with the additional element of notice, the Supreme Court still reasoned that the maritime status of a supplier's lien could not be destroyed by a mortgage lien preclusionary clause.

In conclusion, the Supreme Court's holding in *The Northern Star,* the reasoning behind the decision, and the cases that follow the decision all prove that the second step in Israel's argument is fatally defective.

(3) *The proviso of § 951—its impact on priorities.*

Once Step 2 of the mortgagee's argument fails and the American suppliers' liens are assured maritime status, then step 3 of the mortgagee's argument fails also. This follows because once the maritime status of these suppliers' liens is recognized, their priority *vis a vis* a preferred foreign ship mortgage is controlled by the proviso of § 951. Israel can only prevail if it destroys the maritime status of the American supplier's lien. The principle enunciated in *The Northern Star* forbids this destruction. Thus the American suppliers retain their maritime liens and the proviso of § 951 elevates their liens to priority over the preferred ship mortgage lien of Israel.[46]

---

44. See footnote 36 *supra.*

45. 271 U.S. 552, 554, 46 S.Ct. 589, 590.

46. This is exactly the result reached by Judge Watkins in The Tradewind, 144 F.Supp. 408 (D.C.Md.1956). In discussing The Tradewind's holding on this point Gilmore and Black state:
 "The statute is notably obscure on this point, but Judge Watkins holding seems the only way of giving effect to the clearly declared Congressional policy of preferring American materialmen over foreign ship mortgages; given the opposite holding, the materialmen would be as badly off, vis a vis the foreign ship mortgage, as they now are with respect to ships under charter or American flag ships subject to a preferred mortgage. That result Congress evidently wished to prevent, even though the mortgagee in many cases (not, however, in The Tradewind) will be the United States. If the Tradewind holding does not accurately express the congressional intent, it should be up to Congress to clarify the statute." G. Gilmore & C. Black, Admiralty, § 9–70 p. 614 (1957).

course, good practice, but it is not required. It serves a dual purpose of bringing actual knowledge home to the potential lienor of the existence of a preferred ship mortgage and may, if carefully drafted, constitute a notice prohibiting liens at all as permitted under the maritime lien statute. 46 U.S.C. § 973.

In Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 261 F.2d 861, 867 (5th Cir. 1958), Judge Brown, again speaking for the Court stated:
 Indeed, it seems incongruous to argue that the taking of a mortgage on the vessel, the very subject of a maritime lien, is evidence of a purpose to rely solely on the personal credit of the owner. If it proves anything, it proves just the opposite. This is all the more true since any such chattel mortgage by its very nature has little real value against the claims most likely to defeat it— maritime liens for suppliers and torts— unless, as this one did not, an outright prohibition against liens is expressed and knowledge thereof imputed to the lienor under Section 973.

(4) *The legislative history of the 1954 Amendment.*

Israel contends that its position is supported by the legislative history of the 1954 Amendment. Congress in passing the 1954 amendment was concerned with the problem faced by American suppliers when they were requested to furnish supplies and services to a foreign vessel.[47] American suppliers couldn't chase all over the world to learn about foreign mortgages. Thus Congress added the proviso of the 1954 Amendment to obviate any world-wide title search. But, Israel points out, a world-wide title search is unnecessary where, as here, the notice of the mortgage (and the lien preclusionary clause) is clearly posted in the wheelhouse. All the American supplier has to do is check the wheelhouse, not the whole world. Thus, the proviso's protection is not needed or intended for American suppliers in cases like the instant one where there is adequate notice.

The short answer to this analysis is that while Congress might have limited the protection of proviso in this manner it clearly chose not to do so. The proviso's language does not give American suppliers priority "only where there was no actual notice of the mortgage." The proviso's language does not give this priority "only where notice of the foreign mortgage was not posted." The proviso clearly gives the American suppliers priority *always* and says it in unqualified and unambiguous language.[48]

Israel also argues the significance of the proviso's use of the word "subordi-

nate." Israel points out that the proviso did not say that a preferred foreign ship mortgage lien could never take ahead of American suppliers; the proviso only states that these mortgage liens are subordinate to American suppliers' liens. This use of the word "subordinate," according to Israel, meant that Congress contemplated the application of common law principles that have always surrounded mortgages. One such principle is that the first mortgagee can negate the authority of the mortgagor to further encumber the res. This common law principle, argues Israel, is specifically sanctioned by § 973 and should be applied in this case. In short, Congress intended to incorporate in the 1954 Amendment the same balancing of equities respecting due diligence as has always existed between third parties and a mortgagee.

Again, Israel's argument is defeated by a clearly expressed Congressional desire. It was the technicalities and procedural problems of common law property principles which were the very reason for the 1954 Amendment.[49] In amending § 951, Congress intended to simplify the foreclosure procedure. It clearly violates this intention to attempt to engraft common law property principles into the 1954 Amendment.

(5) *Summary*

Israel's lien preclusionary clause cannot destroy the American lienors' priority under the proviso to § 951. This

47. See footnote 36 *supra.* Also see Hearings on H.R. 6276, p. 10.

48. There was good reason for this clarity. The backers of the amendment wanted a non-controversial bill. Hearings on H.R. 6276 p. 7. Prior to the amendment American suppliers always enjoyed priority over mortgages on foreign vessels. Conferring the preferred status of § 953 on certain designated foreign ship mortgages threatened to change this favorable position of the American suppliers. The backers of the bill recognized that such a

change would make the amendment controversial and threaten its passage. Thus the proviso was added to assure that the amendment in no way changed the rights of American suppliers. If the suppliers had for a moment expected to lose their favorable position merely by the insertion of a clause in the mortgage and the posting of notice in the wheelhouse the bill would have ceased to be non-controversial.

49. S.Rep. No. 1219, 83rd Cong., 2d Sess. pp. 3, 4; Hearings on H.R. 6276, p. 2.

proviso is a limitation on the substantive rights of mortgagees seeking to foreclose preferred foreign ship mortgages in United States courts. Israel cannot use the 1954 Amendment to gain the benefits of the Ship Mortgage Act and then use these benefits to destroy the limitation of the 1954 Amendment. Even assuming a valid lien preclusionary clause, Israel can still not prevail since such a clause cannot destroy the maritime status of the American suppliers' liens. Once this maritime status is assured, the proviso of § 951 gives the liens priority over Israel's preferred ship mortgage lien. Finally, the clear language of the proviso, the legislative history of the amendment, and the policies considered by Congress all show that § 951 and its proviso should be interpreted to give priority to the lien of American suppliers.

## V CONCLUSION

I find that Israel's mortgage is a valid preferred foreign ship mortgage as defined in § 951 and that this Court has jurisdiction under § 951 to foreclose this mortgage. To this extent the motion for summary judgment filed by the State of Israel is granted.

I find that the respective priorities in the fund now in the Registry of this Court are:

First, preferred maritime liens as defined in § 953;

Second, the maritime liens of American suppliers as defined in the proviso to § 951;

Third, the preferred mortgage lien of the State of Israel.

To this extent, and without adjudicating the existence or amount of any lien, the motion for summary judgment filed by the intervenor Dade Trading Corp. is granted.